2009 OK 6

**Loyman COSSEY, Plaintiff/Respondent,**

v.

**CHEROKEE NATION ENTERPRISES, LLC, formerly known as Cherokee Nation Enterprises, Inc., and Cherokee Nation Enterprises, Defendant/Petitioner.**

**No. 105,300.**

Supreme Court of Oklahoma.

Jan. 20, 2009.

Rehearing Denied June 11, 2009.

Darren M. Tawwater, Larry A. Tawwater, Oklahoma City, OK, for Plaintiff/Respondent.

Stratton Taylor, Bradley Harold Mallett, Mark Harrison Ramsey, Claremore, OK, for Defendant/Petitioner.

Robert L. Rabon, Hugo, OK, for the Choctaw Nation as Amicus Curiae.

Deanna Hartley–Kelso, Chickasaw Nation Attorney General, and Stephen H. Greetham, Chickasaw Nation Division of Commerce, Ada, OK, for the Chickasaw Nation as Amicus Curiae.

## OPINION

WATT, J.:

¶ 1 We are asked to determine whether the District Court of Rogers County, Oklahoma

(state court), is a "court of competent jurisdiction" as that term is used in the "Tribal Gaming Compact Between the Cherokee Nation and the State of Oklahoma" (the Compact), executed on November 16, 2004. The Compact is based on the Model Tribal Gaming Compact, 3A O.S. Supp.2004 § 281, which is part of the State–Tribal Gaming Act, 3A O.S. Supp.2004 §§ 261–282. The parties to the Compact are the Cherokee Nation (Tribe) and the State of Oklahoma. We hold that the state court is a "court of competent jurisdiction" as that term is used in the Compact executed by the parties.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2 Plaintiff/Respondent Loyman Cossey, a non-Indian,[1] sued Defendants/Petitioners Cherokee Nation Enterprises, L.L.C., formerly known as Cherokee Nation Enterprises, Inc., and Cherokee Nation Enterprises, Inc., (collectively, CNE), in state court for personal injuries he received on October 19, 2005, while he was a customer at the Cherokee Casino in Roland, Oklahoma. CNE appeared specially and moved to dismiss for lack of subject matter and personal jurisdiction, pursuant to 12 O.S. Supp.2004 § 2012(b)(1), (2), and (F)(3). The court denied the motion to dismiss. On January 7, 2008, this Court granted the petition for certiorari filed by CNE for review of the court's order as a certified interlocutory order pursuant to 12 O.S.2001 § 952(b)(3).[2]

1. The terms "non-Indian" and "nonmember" designate a person who is not a member of the Cherokee Nation for purposes of this opinion.

2. The state court ruled, *inter alia*, that Cherokee Nation Enterprises, L.L.C. is subject to the jurisdiction of the state court and that the state court is a "court of competent jurisdiction" as used in the Compact. The court also found that Cherokee Nation Enterprises, L.L.C. is owner and operator of the casino which is open to tribal members and non-tribal customers. Further, the state court ruled that CNE is not entitled to assert the sovereign immunity of the Tribe, "as it is a separate corporate entity from the Cherokee Nation Indian Tribe."

3. Liability for tort claims under the Compact is limited to $250,000.00 per person and $2,000,000.00 per occurrence. This is reflected in the liability insurance policy which CNE was

## II. STANDARD OF REVIEW

¶ 3 We review a question of law. When an assigned error is one of law, the standard of review is *de novo*, a non-deferential, plenary and independent review of the trial court's legal ruling. *Tibbetts v. Sight 'n Sound Appliance Centers, Inc.*, 2003 OK 72, 77 P.3d 1042; *Christian v. Gray*, 2003 OK 10, 65 P.3d 591.

## III. IDENTIFICATION OF PARTIES AND THEIR CONTENTIONS

¶ 4 CNE contends the Cherokee Nation tribal court is the only court of competent jurisdiction to hear a claim which arose in Indian Country against the Tribe. In addition to its argument that it is entitled to assert the immunity of the Cherokee Nation, CNE contends the Compact provides only a limited, conditional waiver of that immunity. CNE further argues that because the state has not complied with federal law, as discussed in Part IV., *infra*, the tribal court is the only court with "civil adjudicatory jurisdiction" in Indian Country and thus is the only "court of competent jurisdiction" to consider Cossey's tort claim. CNE does not dispute the fact that the Tribe consented to suit under the Compact with respect to tort claims but argues that there are limitations on that consent and on the extent of its liability.[3]

¶ 5 Cossey, a non-Indian, contends the Tribe is not a party to this suit[4] and that

required to obtain. CNE additionally argues that the right to sue is conditioned on following the Compact's tort claim procedure by filing notice of the injury and receiving a denial of the claim. In the present case it is undisputed that Cossey followed the claim procedure and that the claim was deemed denied.

4. As a threshold issue, we address Cossey's contention that the Tribe is not a party to this suit. The Compact provides for the operation of "covered games", or "Class III gaming activities", on the Tribe's "Indian lands" as a means of generating revenues for purposes authorized by the federal Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2710 et seq. Section 2710(d) of the IGRA provides for "Class III gaming activities" on Indian lands only under certain conditions. These activities must be authorized by an ordinance or resolution adopted by the Tribe's gov-

erning body. Class III gaming must be conducted within the structure of a Tribal–State compact executed by the Tribe and the State. See 25 U.S.C. § 2710(d)(1)(A), (B) and (C) which provide:

(d)(1) Class III gaming activities shall be lawful on Indian lands only if such activities are—

(A) authorized by ordinance or resolution that—

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b) of this section, and

(iii) is approved by the Chairman,

(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

The Tribe's ordinance or resolution must be approved by the Chairman who will then publish it and the order of approval in the Federal Register. See § 2710(d)(2)(B). "Chairman" is defined as the Chairman of the National Indian Gaming Commission. 25 U.S.C. § 2703(2).

On November 15, 2004, the Council of the Tribe executed "A Resolution Authorizing a Gaming Compact with the State of Oklahoma." It provides in part:

**WHEREAS,** the Nation will significantly benefit by operating under the terms of a State–Tribal Gaming Compact proposed by the State–Tribal Gaming Act, Oklahoma Senate Bill 1252, enacted November 2, 2004 by vote of the people in Oklahoma as State Question 712, Title 3A, Section 261 et seq.;

**WHEREAS,** the State–Tribal Gaming Act requires that to become effective it must be executed by a duly authorized tribal official, and intergovernmental compacts are required to be ratified by the Council of the Cherokee Nation, under Legislative Act 15–01.

**BE IT RESOLVED BY THE CHEROKEE NATION,** that the Principal Chief is hereby authorized to execute the State–Tribal Gaming Compact on behalf of the Cherokee Nation, and to submit the compact as required by federal law for approval.

The Resolution acknowledges the state law requirement, under 3A O.S. Supp.2004 § 280, for execution of the compact by a duly authorized tribal official and the tribal law requirement that "intergovernmental compacts are required to be ratified by the Council" of the Tribe. Thus, in accordance with both provisions, the Resolution authorizes the Principal Chief to execute the Compact on behalf of the Tribe and to submit it for approval to the Secretary of the Interior (Secretary) who must publish the Compact in the Federal Register. The Compact is signed by the Principal Chief on behalf of the Tribe. The approval of the Office of the Secretary is dated December 28, 2004.

Throughout the Compact, the Tribe is referred to as the "Enterprise" which is defined as:

[T]he tribe or the tribal agency or section of tribal management with direct responsibility for the conduct of covered games, the tribal business enterprise that conducts covered games, or a person, corporation or other entity that has entered into a management contract with the tribe to conduct covered games, in accordance with IGRA. The names, addresses and identifying information of any covered game employees shall be forwarded to the SCA [State Compliance Agency] at least annually. In any event, the tribe shall have the ultimate responsibility for ensuring that the tribe or enterprise fulfills the responsibilities under this Compact. For purposes of enforcement, the tribe is deemed to have made all promises for the enterprise; . . . .

The Compact requires the Tribe, or Enterprise which manages the casino's operations, to maintain "public liability insurance" for the purpose of covering and satisfying tort claims. The "Articles of Organization of a Cherokee Nation Limited Liability Company" was executed on April 19, 2006, denoting the name of the limited liability company as "Cherokee Nation Enterprises, L.L.C." It is signed by the resident agent in Indian Country, Robert A. Huffman, Jr., for the stated purpose of forming a Cherokee Nation limited liability company and provides the following as to "Membership" of the Company:

Ownership of the company shall be vested in its membership. The **sole and exclusive member of the company shall be the Cherokee Nation,** a federally recognized Indian tribe, or its successors or assigns. (Emphasis added.)

The Operating Agreement of Cherokee Nation Enterprises, L.L.C. was executed July 14, 2006. It provides that the "Member" of the Agreement, Cherokee Nation Businesses, L.L.C., (CNB), enters into the Agreement to adopt an operating agreement for CNE as the "Company" under the Cherokee Nation Limited Liability Act, Cherokee Nation Legislative Act 32–04. It provides that the Company's sole Member is CNB, a single-member Cherokee Nation L.L.C. which is wholly-owned by the Tribe. It also explains the Tribe structured CNB and CNE so that each of them shares in the Tribe's federal tax immunity. Operating Agreement, Art. 1.6.3. It refers to the Cherokee Nation Limited Liability Company Act, Cherokee Nation Legislative Act 32–04, and the Articles of Organization. It states the purpose of the Company is to engage in any lawful activity for which limited liability companies may be organized under the Act. Operating Agreement, Art. 1.4. It also provides that the Company, i.e., Cherokee Nation Enterprises, L.L.C., is the successor by merger with Cherokee Nation Enterprises, Inc.

It is evident that the Compact's provisions and the Tribe's authorizing documents indicate the "Tribe" and the "Enterprise", which includes the LLC known as "CNE", all refer to the Tribe for purposes of the duties, management and respon-

CNE may not assert the Tribe's sovereign immunity. He also argues that the doctrine of sovereign immunity was never meant to protect entities conducting "non-tribal business" which is unrelated to the activity of furthering tribal self-government, citing *Dixon v. Picopa Constr. Co.*, 160 Ariz. 251, 772 P.2d 1104 (1989). He also contends the state courts have at least concurrent jurisdiction with tribal courts over his tort claim because the Tribe consented to suit under the Compact which is derived from the Oklahoma Statutes.

¶ 6 While we agree with Cossey, and we hold, that the Tribe, in conducting "non-tribal business," is not entitled to sovereign immunity from suit in state court in this case,[5] we disagree that state court jurisdiction over his tort claim is derived totally from the Tribe's consent to suit under the Compact.

## IV. STATE COURT JURISDICTION OF CLAIMS ARISING ON INDIAN LAND AND THE EFFECT OF "PUBLIC LAW 280"

¶ 7 To support its contention that state courts have no jurisdiction over tort claims under the Compact, CNE refers us to Part 9 of the Compact. It provides the following:

> sibility of the casino in Roland, Oklahoma. The Tribe was authorized to enter into the Compact. The Compact and other documents comply with the State–Tribal Gaming Act which is authorized by the federal act, IGRA. Therefore, we reject Cossey's argument that the Cherokee Nation is not a party to this suit.

5. It becomes unnecessary to consider Cossey's contention, and the trial court's finding, that CNE may not assert the Tribe's sovereign immunity.

6. The 1953 statute allowed the states to assume civil and criminal jurisdiction without the consent of the tribes.

7. **Okla. Const., Art. I, § 3. Unappropriated public lands-Indian lands-Jurisdiction of United States**

> The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been

This Compact shall not **alter** tribal, federal or state civil adjudicatory or criminal jurisdiction. (emphasis added).

¶ 8 CNE contends the above section does not provide Oklahoma courts with jurisdiction over claims in Indian Country. It contends Oklahoma had not acquired civil adjudicatory jurisdiction over such claims before the Compact was executed because the State has failed to comply with federal law enacted in 1953 known as "Public Law 83–280" (PL–280).[6] When Oklahoma entered the Union, our constitution provided that the State of Oklahoma relinquished any right to control Indian tribes or enter upon tribal lands.[7] PL–280 allowed states such as Oklahoma to take affirmative action through constitutional amendment or enactment of a statute to assume criminal and/or civil jurisdiction over "Indian Country." In 1968, PL–280 was amended as part of the Indian Civil Rights Act (ICRA). See 25 U.S.C. §§ 1321–1326; P.L. 90–284, Title IV, § 401 (1968); 82 Stat. 77, codified, and as amended, 25 U.S.C. §§ 1301–1303, in 1982 and thereafter. It provided for the states' assumption of civil jurisdiction over claims arising in Indian Country but required the "consent of the tribe occupying the particular Indian country." See 25 U.S.C. § 1322(a).[8]

> extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. Land belonging to citizens of the United States residing without the limits of the State shall never be taxed at a higher rate than the land belonging to residents thereof. No taxes shall be imposed by the State on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use.

8. *25 U.S.C. § 1322. Assumption by State of civil jurisdiction*

> (a) Consent of United States; force and effect of civil laws
> The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country

¶ 9 This Court acknowledged Oklahoma did not take steps to assume jurisdiction under the previous PL–280 in *Lewis v. Sac and Fox Tribe of Oklahoma Housing Authority.*[9] We held that "[b]ecause Oklahoma did not take the appropriate steps to take jurisdiction under PL–280, the proper inquiry to be made in this case must focus upon the congressional policy of fostering tribal autonomy in the light of pertinent U.S. Supreme Court jurisprudence." *Lewis,* 896 P.2d at 507, n. 21 (citation omitted). CNE contends the consent under the Compact is ineffective because there was no vote taken by the entire tribal membership, as required by *Kennerly v. District Court of Ninth Judicial District of Montana,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507.[10] We disagree.

¶ 10 *Kennerly* and the cases upon which it relied are distinguishable. There was no federal statute, such as the IGRA, containing specific requirements for approval by the Tribe's governing body to engage in Class III gaming. Moreover, the IGRA also provides that such gaming is to be subject to state law, i.e., the Model Tribal Gaming Compact, 3A O.S. Supp.2004 § 281, which is part of the State–Tribal Gaming Act, 3A O.S. Supp.2004 §§ 261–282. See § 2710(d)(2)(C) of the IGRA which provides:

> or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

9.  1994 OK 20, 896 P.2d 503. *Lewis* considered, *inter alia,* whether Congress ousted state courts of concurrent jurisdiction to consider contract actions involving land transactions between Indian buyers and statutorily created Indian housing authorities of the state.

10.  However, we noted in *Lewis* that *Kennerly,* which relied on *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), does not stand as authority defeating concurrent state jurisdiction in all civil cases, but "is concerned solely with the procedural mechanisms by which tribal consent must be registered." *Lewis,* 1994 OK 20, ¶ 9, 896 P.2d at 508, quoting *Kennerly,* 400 U.S. at 430, 91 S.Ct. at 483. Citing *Kennerly* and *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106, this Court also stated:

(C) Effective with the publication under subparagraph (B) of an ordinance or resolution adopted by the governing body of an Indian tribe that has been approved by the Chairman under subparagraph (B), **class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal–State compact entered into under paragraph (3)** [11] **by the Indian tribe that is in effect.** (emphasis added).

¶ 11 See also *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), which held PL–280 is not independently sufficient to confer jurisdiction on a State to extend the full range of regulatory authority over Indians and reservations. We hold that Public Law 280 is not an impediment to state court jurisdiction and is, in fact, inapplicable to this case.

## V.  TRIBAL COURT'S JURISDICTION UNDER THE INDIAN GAMING REGULATORY ACT

¶ 12 We next consider whether Congress, through the enactment of the IGRA, enlarged tribal-court jurisdiction. The

> The Court reasoned that tribal courts provide the appropriate forum for settlement of those disputes over personal and property interests of Indians which *arise out of tribal relationships.* The teachings of *Kennerly* and *Fisher* do not divest state courts of cognizance over all disputes among Indians. *Where, as here, state law is implicated, governs the transaction and is invoked, and there is no infringement upon tribal self-government, there can be no barrier to state cognizance.* (Footnote omitted) (Emphasis in original).
> . . .
> In sum, whenever Indian interests are tendered in a controversy, a state court must make a preliminary inquiry into the nature of the rights sought to be settled. Only that litigation which is explicitly withdrawn by Congress or that which infringes upon tribal self-government stands outside the boundaries of permissible state-court cognizance.... (Footnote omitted.)
> *Lewis v. Sac and Fox Housing Authority,* 1994 OK 20, ¶¶ 10, 12, 896 P.2d at 508.

11.  Paragraph 3 of subsection (d) provides for negotiation between the Tribe and State in good faith to enter into a compact, the approval by the Secretary published in the Federal Register, and

IGRA provides at § 2710(d)(3)(C) a list of provisions which any negotiated tribal-state compact "may" include. "May" is ordinarily construed as permissive, while "shall" is ordinarily construed as mandatory. See *Osprey L.L.C. v. Kelly–Moore Paint Co., Inc.,* 1999 OK 50, 984 P.2d 194; *Shea v. Shea,* 1975 OK 90, 537 P.2d 417. Section 2710(d)(3)(C) provides in part:

(C) Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to—

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the **allocation** of criminal and civil **jurisdiction** between the State and the Indian tribe necessary for the enforcement of such laws and regulations; . . . .

(emphasis added).

■ ¶ 13 The Compact here does not include any such allocation of jurisdiction. Instead, the Compact provides only: "This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction" and that tort claims may be heard in a "court of competent jurisdiction." The Tribe could have, but did not, include such jurisdictional allocation in this Compact. Neither the IGRA nor the Compact as approved enlarged the Tribe's jurisdiction.

## VI. COURT OF COMPETENT JURISDICTION AND DUAL SOVEREIGNTY

¶ 14 In determining whether Oklahoma courts are "courts of competent jurisdiction"

in this case, we address subject matter jurisdiction and the sovereign immunity of the Tribe as a defense to being sued in state court. We are concerned with tribal and state court jurisdiction over the activities of non-Indians on "Indian lands." [12]

■ ¶ 15 A "court of competent jurisdiction" is one having jurisdiction of a person and the subject matter and the power and authority of law at the time to render the particular judgment. See *Ex Parte Plaistridge,* 1918 OK 352, 68 Okla. 256, 173 P. 646; *Ex Parte Justus,* 1909 OK CR 132, 104 P. 933, 3 Okla.Crim. 111. See also *Choctaw County Excise Board v. St. Louis–San Francisco Railway Company,* 1969 OK 110, 456 P.2d 545.

¶ 16 While the ultimate issue on remand will be the tribe's liability for the injuries Cossey sustained at the casino, we first consider Cossey's status as a non-Indian citizen of Oklahoma and his right of access to Oklahoma courts to seek a remedy for his injuries. See Okla. Const., Art. 2, § 6.[13] Our constitution recognizes that the state of Oklahoma is an inseparable part of the federal union and that the United States Constitution is the supreme law of the land. Okla. Const., Art. 1, § 1.[14] When our constitution was revised in 1967, existing courts were abolished, and the district courts were designated to succeed all previous courts on the effective date, and with that designation, the "jurisdiction, functions, powers and duties [were] transferred to the respective District Courts." Okla. Const., Art. 7, § 7(b). District courts were vested with "unlimited original jurisdiction of all justiciable matters . . . and such powers of review of administrative

the provisions which "may" be included in the Compact.

12. "Indian lands" is defined by the IGRA, 25 U.S.C. § 2703(4) (1992), as:

(4) The term "Indian lands" means—
(A) all lands within the limits of any Indian reservation; and
(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

13. **Art. II, § 6. Courts of justice open-Remedies for wrongs-Sale, denial or delay**

The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice.

14. **Art. I, § 1. Supreme Law of land**

The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land.

action as may be provided by statute." Okla. Const., Art. 7, § 7(a). Each district court succeeded to and assumed "jurisdiction of all causes, matters and proceedings then pending, with full power and authority to dispose of them and to carry into execution or otherwise to give effect to all orders, judgments and decrees theretofore entered by the predecessor courts." Okla. Const., Art. 7, § 7(c).

¶ 17 The Compact is derived from the Oklahoma Statutes. It incorporates Oklahoma's Governmental Tort Claims Act (GTCA) into its provisions.[15] The district courts of Oklahoma thus have subject matter jurisdiction of any claim arising under the GTCA, including one which originates under the Compact.

¶ 18 In *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001),[16] the Supreme Court recognized the authority of state courts as courts of "general jurisdiction" and further acknowledged our system of "dual sovereignty" in which state courts have concurrent jurisdiction with federal courts, absent specific Congressional enactment to the contrary. Citing *Tafflin v. Levitt,* 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990), the Court stated:

> We turn next to the contention of respondent and the Government that the tribal court, as a court of general jurisdiction, has authority to entertain federal claims under § 1983. It is certainly true that state courts of 'general jurisdiction' can adjudicate cases invoking federal statutes, such as § 1983, absent congressional specification to the contrary. 'Under [our] system of dual sovereignty, we have consistently held that state courts have inher-

ent authority, and are thus **presumptively competent,** to adjudicate claims arising under the laws of the United States,'.... That this would be the case was assumed by the Framers, see The Federalist No. 82, pp. 492–493 (C. Rossiter ed.1961). Indeed, that state courts could enforce federal law is presumed by Article III of the Constitution, which leaves to Congress the decision whether to create lower federal courts at all. This historical and constitutional assumption of concurrent state-court jurisdiction over federal-law cases **is completely missing with respect to tribal courts.**

*Nevada v. Hicks,* 533 U.S. at 366–367, 121 S.Ct. at 2313–2314 (citation omitted) (emphasis added).

¶ 19 The argument was made by the Respondent tribal member and the Government as *amicus curiae* in *Nevada v. Hicks* that the tribal court, as a court of "general jurisdiction," had jurisdiction over his § 1983 civil rights claim against state officials. The Supreme Court disagreed, explaining that state court jurisdiction is general because it can hear all subjects of litigation between parties within its jurisdiction. In distinguishing state and tribal courts, the Court stated:

> Tribal courts, it should be clear, cannot be courts of general jurisdiction in this sense, for a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction....

*Nevada v. Hicks,* 533 U.S. at 367, 121 S.Ct. at 2314.

¶ 20 The Court concluded that tribal authority to regulate state officers in executing process related to state law violations

---

**15.** The Compact, Part 6(A)(1) provides:

...

1. During the term of this Compact, the enterprise shall maintain public liability insurance for the express purposes of covering and satisfying tort claims. The insurance shall have liability limits of not less than Two Hundred Fifty Thousand Dollars ($250,000.00) for any one person and Two Million Dollars ($2,000,000.00) for any one occurrence for personal injury, and One Million Dollars ($1,000,000.00) for any one occurrence for property damage, hereinafter the "limit of liability", or the corresponding limits under the

Governmental Tort Claims Act, whichever is greater. No tort claim shall be paid, or the subject of any award, in excess of the limit of liability.

**16.** The Court was deciding whether a tribal court had jurisdiction to adjudicate the alleged tortious conduct of state wardens in executing a search warrant on reservation land for evidence of an off-reservation crime by a tribal member, and whether the tribal court had jurisdiction over claims against the state officials for the tribal member's claims brought under 42 U.S.C. § 1983.

outside the reservation is not essential to tribal self-government or internal relations, i.e., "the right to make laws and be ruled by them." *Nevada v. Hicks,* 533 U.S. at 364, 121 S.Ct. at 2313; see also *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251. Conversely, the Court held the State had considerable interest in the execution of process, "and even when it relates to Indian-fee lands [17] it no more impairs the tribe's self-government than federal enforcement of federal law impairs state government." *Id.* Because the tribe lacked legislative authority to regulate the state officials' ability to investigate off-reservation state law violations, it also lacked civil adjudicative authority to hear Respondent's claim that the officials violated tribal law in performing their duties. Moreover, the Tribes could not identify any authority to adjudicate Respondent's § 1983 claim. Tribal court jurisdiction does not exceed tribal regulatory jurisdiction "[a]bsent congressional direction enlarging tribal-court jurisdiction...." *Strate v. A–1 Contractors,* 520 U.S. 438, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997); see also *Nevada v. Hicks,* 533 U.S. 353, 357–358, 121 S.Ct. 2304, 2309, 150 L.Ed.2d 398 (2001). Thus, a tribal court is not a court of general jurisdiction. Its jurisdiction could be asserted in matters involving non-Indians **only** when their activities on Indian lands are activities that may be regulated by the Tribe.

## VII. SOVEREIGN INTERESTS AND SOVEREIGN IMMUNITY

¶ 21 In order to determine whether the state court may assert jurisdiction over the tribe in a case brought by a non-Indian, we must consider the nature of the activities of this particular non-Indian plaintiff under these facts and the manner in which these activities affect the tribe's "inherent tribal sovereignty," i.e., its power to self-govern and control its internal tribal re-

lations. Indian tribes retain their inherent power to punish tribal offenders, determine tribal membership, regulate domestic relations among members, and prescribe rules of inheritance for members. *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981). Such powers refer to a Tribe's "inherent sovereign powers," the powers a tribe enjoys apart from express provision by treaty or statute. *Strate v. A–1 Contractors,* 520 U.S. 438, 445–446, 117 S.Ct. 1404, 1416, 137 L.Ed.2d 661 (1997). But this inherent power does not reach beyond what is necessary to protect tribal self-government or to control internal relations. See *Strate v. A–1 Contractors,* 520 U.S. at 459, 117 S.Ct. at 1416; [18] *Montana,* 450 U.S. at 564, 101 S.Ct. at 1257–58.[19] A tribe's exercise of such power is inconsistent with its dependent status and cannot survive without an express congressional delegation of power to the tribes. *Montana,* 450 U.S. at 564, 101 S.Ct. 1245, citing *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973), *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); and *McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

¶ 22 In *Montana,* the United States Supreme Court announced a general rule in addressing the sovereign powers of a tribe. Generally, tribes have no authority over the activities or conduct of nonmembers of the tribe. This general rule contained two exceptions which will, if found to be present under the facts, give a tribe the power to regulate the activities in question under its inherent sovereign powers over non-Indians on their reservations, even on non-Indian fee lands:

17. "Fee lands" are lands which have been alienated to non-Indians. See *Strate v. A–1 Contractors,* 520 U.S. 438, 456, 117 S.Ct. 1404, 1414, 137 L.Ed.2d 661 (1997).

18. It was held that neither regulatory nor adjudicatory authority over the state highway accident at issue was needed to preserve "the right of reservation Indians to make their own laws and

be ruled by them," citing *Williams,* 358 U.S., at 220, 79 S.Ct., at 271.

19. It was held in *Montana* that the regulation of hunting and fishing by nonmembers of a tribe on lands no longer owned by the tribe bears no clear relationship to tribal self-government or internal relations.

A tribe may regulate through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.

A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on the lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana,* 450 U.S. at 565–66, 101 S.Ct. at 1258.

¶ 23 If non-Indians' activities fall within the *Montana* exceptions, the tribe may regulate those activities under its sovereign powers. If the tribe has power to regulate, or legislate, the activities of the Plaintiff non-members, the tribe may also have civil adjudicatory authority, or jurisdiction, over the non-members' activities in tribal court. However, without that power to regulate non-members' activities, the Tribe may not assert civil jurisdiction over them in tribal court. See *Strate,* 520 U.S. at 453, 117 S.Ct. at 1413; *Nevada v. Hicks,* 533 U.S. at 374, 121 S.Ct. at 2318; and *Plains Commerce Bank v. Long Family Land and Cattle Company, Inc.,* —— U.S. ——, 128 S.Ct. 2709, 2720, 171 L.Ed.2d 457 (2008), (see discussion, *infra*). As pertinent to the instant case, a tribe would also have immunity from being sued in state court. As we noted recently in *Bittle v. Bahe,* "It is the sovereignty that gives rise to the immunity from private suit in order to protect the dignity of the sovereign." [20]

¶ 24 We must determine whether Cossey's activities come within those which may be regulated by the tribe as a sovereign entity. We must, therefore, consider whether his activities come within the definition of

the tribe's sovereign interests, the *Montana* exceptions, or a federal statute or treaty enlarging the Tribe's powers.

¶ 25 Under *Montana,* the tribes' retained inherent powers of self-government involve only the **relations among members of a tribe.** It is consistent with the "dependent status" of tribes; it is necessarily inconsistent with their freedom to determine their "external relations." [21]

¶ 26 Under the Supreme Court's newest pronouncement, *Plains Commerce Bank v. Long Family Land and Cattle Company, Inc.,* —— U.S. ——, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008), tribal members (the Longs) brought a discrimination claim in tribal court against the bank (Plains). They alleged Plains did not give them an equal opportunity to buy certain fee land which the Longs leased from Plains. The Longs attempted to enforce a tribal tort law which set limits on the sale of fee lands by nonmembers, even to the extent of regulating the substantive terms on which the Bank could offer it for sale. Acknowledging this was a form of regulation, the Longs argued that it was nevertheless authorized by the first *Montana* exception.

¶ 27 The Court held that *Montana* does not permit tribes to regulate the sale of non-Indian fee land. The particular land had ceased being part of the tribe's land many years earlier. Instead, it explained that *Montana* and its progeny "permit tribal regulation of nonmember *conduct* inside the reservation that implicates the tribe's sovereign interests." *Plains,* 128 S.Ct. at 2721 (emphasis in original). The Court further stated:

> *Montana* expressly limits its first exception to the 'activities of nonmembers,' ... allowing these to be regulated to the extent necessary 'to protect tribal self-government [and] to control internal rela-

---

**20.** 2008 OK 10, ¶ 22, 192 P.3d 810, 819. We held the tribe's immunity from suit in state court was waived when it agreed to be bound by the laws of this state, including a common law negligence action for dram shop liability.

**21.** In *San Manuel Indian Bingo and Casino v. NLRB,* 475 F.3d 1306, 1315 (D.C.Cir.2007), the D.C. Circuit Court of Appeals held the operation of a casino is not a traditional attribute of self-

government, but was virtually identical to purely commercial casinos across the United States. It also held that most of the casino's employees and customers were not tribal members and lived off the reservation. For those reasons, it held its sovereignty was not called into question because the tribe was not simply engaged in internal governance of its territory and members.

tions,'.... ('*Montana* does not grant a tribe unlimited regulatory or adjudicative authority over a nonmember. Rather, *Montana* limits tribal jurisdiction under the first exception to the regulation of the *activities* of nonmembers' (internal quotations omitted; emphasis added)). *Plains*, 128 S.Ct. at 2721.

¶ 28 The Court held that the sale of such land did not affect the Tribe's sovereign interests. The Court stated the logic of *Montana*:

[C]ertain activities on non-Indian fee land (say, a business enterprise employing tribal members) or certain uses (say, commercial development) may intrude on the internal relations of the tribe or threaten tribal self-rule. To the extent they do, such activities or land uses may be regulated. See *Hicks, supra*, at 361, 121 S.Ct. 2304 ("Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them"). Put another way, certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight. While tribes generally have no interest in regulating the conduct of nonmembers, then, they **may regulate nonmember behavior** that implicates **tribal governance** and **internal relations.**

*Plains*, 128 S.Ct. at 2723 (emphasis added).

¶ 29 The *Plains* Court stated that the regulations it had approved under *Montana* "all flow directly from these limited sovereign interests." 128 S.Ct. at 2723.[22] However, the Court held that the "regulation of the sale of non-Indian fee land, unlike the above, cannot be justified by reference to the tribe's sovereign interests." 128 S.Ct. at 2723. The land had already been alienated from the tribal trust; it had ceased being tribal land. *Id.* The Court stated, at 128 S.Ct. at 2724:

Not only is regulation of fee land sale beyond the tribe's sovereign powers, it runs the risk of subjecting nonmembers to

tribal regulatory authority without commensurate consent. Tribal sovereignty, it should be remembered, is 'a sovereignty outside the basic structure of the Constitution.' *United States v. Lara*, 541 U.S. 193, 212, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (KENNEDY, J., concurring in judgment). The Bill of Rights does not apply to Indian tribes. See *Talton v. Mayes*, 163 U.S. 376, 382–385, 16 S.Ct. 986, 41 L.Ed. 196 (1896). Indian courts 'differ from traditional American courts in a number of significant respects.' *Hicks*, 533 U.S., at 383, 121 S.Ct. 2304 (SOUTER, J., concurring).

¶ 30 The regulation imposed on nonmembers "must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Plains*, 128 S.Ct. at 2724, citing *Montana*, 450 U.S. at 564, 101 S.Ct. 1245. Without the logic of *Plains*, which incorporates the general rule of *Montana* and its exceptions, Cossey and all other non-Indians would unknowingly subject themselves to tribal regulation and, thus, to tribal court jurisdiction without their consent merely by entering a casino in Indian Country. Moreover, without *Plains* and *Montana*, non-Indians could unwittingly waive their rights to seek relief in the state courts of Oklahoma.

■ ¶ 31 Citing *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001), the *Plains* Court referred to the general proposition under *Montana* that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. "[E]fforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are 'presumptively invalid,' *Atkinson, supra*, at 659, 121 S.Ct. 1825. The burden rests on the tribe to establish one of the exceptions to *Montana's* general rule that would allow an extension of tribal authority to regulate nonmembers on non-Indian fee land. *Atkinson*, 532 U.S., at 654, 121 S.Ct. 1825." *Plains*, 128 S.Ct. at 2720. In the present case, we find the Tribe has

---

**22.** The Court enumerated previous cases in which it held the *Montana* exceptions applied and regulation was approved by the Court. These include the power to set conditions on entry to tribal land via licensing requirements, hunting regulations, and taxation. 128 S.Ct. at 2723 (Citations omitted).

not met its burden of establishing that it falls within one of *Montana's* exceptions.

¶ 32 The Court also discussed the status of the land at issue as it related to the regulation of nonmember activity on the land. In *Plains,* this was fee land, i.e., land which had been previously alienated from tribal lands within the reservation. The Court approvingly quoted from Justice Souter's concurring opinion in *Nevada v. Hicks,* stating, "The status of the land is relevant 'insofar as it bears on the application of … *Montana's* exceptions to [this] case.'" *Nevada v. Hicks,* 533 U.S. at 376, 121 S.Ct. 2304 (SOUTER, J., concurring). Although *Plains* did not specifically quote further from Justice Souter's concurring opinion, we find it to be instructive in the instant case, in which a non-Indian defendant was injured on trust land. It provides, in part:

> *Montana* applied this presumption against tribal jurisdiction to nonmember conduct on fee land within a reservation; I would also apply it where, as here, a nonmember acts on tribal or trust land, and I would thus make it explicit that land status within a reservation is not a primary jurisdictional fact, but is relevant only insofar as it bears on the application of one of *Montana's* exceptions to a particular case….
>
> …
>
> After *Strate,* it is undeniable that a tribe's remaining inherent civil jurisdiction to adjudicate civil claims arising out of acts committed on a reservation depends in the first instance on the character of the individual over whom jurisdiction is claimed, not on the title to the soil on which he acted. The principle on which *Montana* and *Strate* were decided (like *Oliphant*[ *v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978) ] before them) looks first to human relationships, not land records, and it should make no difference *per se* whether acts committed on a reservation occurred on tribal land or on land owned by a nonmember individual

in fee. It is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact.

*Nevada v. Hicks,* 533 U.S. 353, 375–376, 381–82, 121 S.Ct. 2304, 2318–19, 2322 (SOUTER, J., concurring). In a footnote following the above excerpt Justice Souter explained that land status is not irrelevant to a proper application of *Montana,* only that it is not determinative.

¶ 33 Thus, it is the regulation of the activities of non-members on the land, rather than the resale of the land, which the *Plains* Court found to be the key point with regard to the tribe's sovereign interests. 128 S.Ct. at 2724. In fact, the Court stated that in none of its previous cases has it found that *Montana* authorized a tribe to regulate the sale of non-Indian fee land. "Rather, our *Montana* cases have always concerned non-member conduct on the land." *Plains,* 128 S.Ct. at 2722, citing *Hicks,* 533 U.S., at 359, 121 S.Ct. at 2309–10 (citations omitted).

## VIII. COSSEY'S ACTIVITIES IN INDIAN COUNTRY

¶ 34 In the present case, the land on which the casino is located is not "fee lands," but "land held in trust" for the Tribe.[23] As stated above, such land qualifies as "Indian land" for purposes of the IGRA. However, the difference in the status of the land does not take this case out of the *Montana* rule.

¶ 35 Cossey was on the casino premises as an invitee of the Tribe. As such, the Tribe had the duty to exercise reasonable care to keep the premises in a reasonably safe condition and to warn Cossey of conditions which were in the nature of hidden dangers, traps, snares or pitfalls. See *Martin v. Aramark Services, Inc.,* 2004 OK 38, 92 P.3d 96. However, the Tribe's obligation to compensate Cossey for his injuries, upon proper proof,

---

23. Cossey has alleged that the casino is located on land outside the reservation, making the Compact invalid. The Tribe alleged the land is held "in trust" by the federal government for the Tribe, which comes within the definition of "Indian lands" under the IGRA. At this point in the proceedings, we consider only whether the state court is a court of competent jurisdiction, a question of law. Upon remand, the trial court can rule appropriately as the facts are further developed.

has not been in dispute by these parties.[24] The dispute centers around whether the state court has jurisdiction over his claim.

¶ 36 We examine whether Cossey's activity, i.e., visiting the casino as an invitee on Indian lands, is an activity which the Tribe can regulate under its "inherent sovereign interests." If such activity is one which comes within the *Montana* exceptions, the Tribe can regulate it and assume civil adjudicatory jurisdiction over him in tribal court.

¶ 37 Cossey entered into no consensual relationship with the Tribe "through commercial dealing, contracts, leases, or other arrangements" by entering the casino as a customer. The Compact represents a consensual relationship between the Tribe and the State, but Cossey was not a party to it. Moreover, his presence at the casino on reservation lands was not conduct which "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." See *Montana*, 450 U.S. at 566, 101 S.Ct. at 1258. Neither *Montana* exception helps the Tribe in this case.

## IX. CONCLUSION

¶ 38 The Oklahoma district court is a "court of competent jurisdiction" to hear Cossey's tort claim. The Tribe's sovereign interests are not implicated so as to require tribal court jurisdiction under the exceptions in *Montana*, supra. Cossey's right to seek redress in the Oklahoma district court is guaranteed by our Constitution. Moreover, the United States Supreme Court has upheld *Montana* and the cases following it, indicating the Court's continued recognition of the need to protect the sovereign interests of Indian tribes, while acknowledging the plena-

ry powers of the states to adjudicate the rights of their citizens within their borders.

¶ 39 The order of the trial court denying the Tribe's motion to dismiss is affirmed. This case is remanded to the trial court for further proceedings in accordance with the views expressed in this opinion.

¶ 40 The remaining arguments raised by the parties are non-persuasive and will not be considered.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

TAYLOR, V.C.J., OPALA, WATT, WINCHESTER, JJ., concur.

COLBERT, J., concurring specially.

EDMONDSON, C.J., KAUGER, J., concur in part, dissent in part.

HARGRAVE, REIF, JJ., dissent.

TAYLOR, V.C.J., with whom OPALA, J., joins, concurring:

¶ 1 I join in the majority opinion. I write separately to contribute further analysis of the federal and state statutes authorizing the state-tribal gaming compact and to address the positions taken in the dissenting opinion.

¶ 2 Today we decide that 1) the state district court is a court of competent jurisdiction under the gaming compact between the State of Oklahoma and the Cherokee Nation, 2) the Cherokee Nation's sovereign interests are not implicated in the suit, and 3) Cossey's right to seek redress in state court is guaranteed by the state constitution. Relying upon well-established state law, we construe "court of competent jurisdiction" under the tribal gaming compact to include the state district court. Relying upon state and federal jurisprudence,[1] we determine Public Law 280 [2] is

---

**24.** We offer no opinion as to the validity of Cossey's claim for injuries in this opinion. Upon remand, the adjudication of the claim will proceed in the trial court.

**1.** *Lewis v. Sax and Fox Tribe*, 1994 OK 20, 896 P.2d 503; *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).

**2.** 67 Stat. 588 (1953)(wherein Congress consented to state assumption of jurisdiction over civil

causes of action arising in Indian country between Indians or to which Indians are parties, codified at 25 U.S.C. § 1322). *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), addressed the requirements of Public Law 280. In *Yakima*, the U.S. Supreme Court noted that the enabling acts for eight states, Arizona, Montana, New Mexico, North Dakota, South Dakota, Utah, Washington, and Oklahoma, required disclaimer of jurisdiction over Indian lands in their state constitutions.

not an impediment to the exercise of state court jurisdiction. We also determine that exercise of state court jurisdiction is consistent with federal Indian law.[3]

¶ 3 The majority interprets "court of competent jurisdiction" within the meaning of the compact with the Cherokee Nation. Because Oklahoma offers the one and only statutory model tribal compact to all Oklahoma Indian tribes, I would go further and hold that the state district court is a court of competent jurisdiction as that term is used in the Model Tribal Gaming Compact codified at 3A O.S. Supp.2004, § 281. Even though Indian-law disputes most often require case-by-case resolution in light of the individualized tribal circumstances, treaties, and laws, construing the phrase "court of competent jurisdiction"

for all Indian tribes that enter into the statutory model compact would be consistent with the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2722, and federal principles of statutory construction.[4]

¶ 4 Congress enacted the Indian Gaming Regulatory Act in response to the ruling in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). *Cabazon* decided that an Indian tribe may operate bingo games on an Indian reservation located in a state that permits gaming for any purpose and that state law does not apply to bingo games played predominantly by non-Indians coming onto the Indian reservation. The dissent to the *Cabazon* opinion urged that a state has a legitimate law enforcement interest in Indian

---

The *Yakima* decision quotes portions of the enabling act for the Dakotas, Montana, and Washington that required the states to disclaim any right and title to unappropriated public lands and to Indian lands and to acknowledge that **Indian lands shall remain under the absolute jurisdiction and control of Congress** until the title has been extinguished by the United States. 439 U.S. at 480–481, 99 S.Ct. at 752. The language in Oklahoma's constitution is different. It disclaims all right and title to unappropriated public lands and Indian lands and acknowledges that "until title to any **such public lands** shall have been extinguished by the United States, the same **shall be and remain subject to the jurisdiction, disposal, and control of the United States.**" Section 3 of Article I of the Oklahoma Constitution is set out in full in the majority opinion at footnote 7. This constitutional provision disclaims title to and jurisdiction over unappropriated public lands and it disclaims title to Indian lands **but it does not disclaim jurisdiction over Indian lands.** The *Yakima* Court failed to recognize this difference in the Oklahoma's constitutional language. Notwithstanding, this Court has followed *Yakima* and recognized Oklahoma as a disclaimer-of-jurisdiction state for purposes of Public Law 280. *Ahboah v. Housing Authority of Kiowa Tribe of Indians*, 1983 OK 20, 660 P.2d 625.

3. The federal cases discussed in today's opinion include *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)(establishing the general rule that Indian tribes have no authority over activities or conduct of nonmembers except that (1) a tribe has authority to regulate a nonmember who has a consensual relationship with the tribe and (2) a tribe has adjudicatory authority over conduct of a nonmember in Indian country if the conduct threatens or has some direct effect on the political integrity, the economic security, or the health or

welfare of the tribe); *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (pronouncing that tribal court jurisdiction is no greater than the tribe's legislative authority absent congressional direction enlarging tribal court jurisdiction); *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001)(deciding that tribal courts are not courts of general jurisdiction nor are tribal courts included in the historical and constitutional assumption of concurrent state-court jurisdiction to adjudicate claims arising under laws of the United States); *Plains Commerce Bank v. Long Family Land and Cattle Company*, —— U.S. ——, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008) (teaching that tribal laws and regulations may be imposed on a nonmember only if the nonmember has consented, expressly or by his actions, and then the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry into Indian country, to preserve tribal self-government, or to control internal affairs).

4. Basic rules of federal statutory construction provide that where a statute does not define its terms, the court will give the terms their ordinary and natural meaning, *Smith v. U.S.*, 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993); if a phrase is not commonly understood, the court will inquire into the contemporaneous understanding, *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 759, 100 S.Ct. 2455, 2460, 65 L.Ed.2d 488 (1980), or the common law meaning of the phrase, *Gilbert v. U.S.*, 370 U.S. 650, 655, 82 S.Ct. 1399, 1402, 8 L.Ed.2d 750 (1962); and the rule that ambiguous terms will be construed in favor of Indians applies where the language of a treaty with the United States is being interpreted, but it is not a mandatory guide for interpreting statutes. *Chickasaw Nation v. United States*, 534 U.S. 84, 122 S.Ct. 528, 535–536, 151 L.Ed.2d 474 (2001).

gaming that caters to non-Indians where Congress has not set aside the state's interests through federal regulation of Indian gaming. The *Cabazon* ruling impelled Congress to legislate in the area. S.Rep. No. 100–446, reprinted in 1988 U.S.C.C.A.N. p. 3071.

¶ 5 Congress had considered the problems and benefits of Indian gaming in committee hearings for at least three years before *Cabazon.* Congress enacted Public Law 100–446, finding that gaming was a means of economic development for the tribes that would promote tribal self-sufficiency and strengthen tribal governments. 102 Stat. 2467 (1988). Public Law 100–446 legalized gaming in Indian country, 18 U.S.C. §§ 1166–1168, within the framework for regulating gaming in Indian country in the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2722. IGRA attempted to balance the federal, tribal and state interests in Indian gaming through a system of joint regulation.[5] IGRA established three classes of Indian gaming. *Id.* § 2703(6), (7) and (8). As to class I gaming (social games with prizes of minimal value and tribal ceremonial or celebrating games), tribal regulation is exclusive. *Id.* § 2710(a). As to class II gaming (bingo games played with cards, pull-tabs, lotto, punch boards and other games similar to bingo games played with cards), tribal regulation is subject to approval, monitoring, and continued approval of a federal Indian gaming commission. *Id.* As to class III gaming (all gambling not included in Class I or Class II), tribal regulation is defined and confined by a tribal-state compact with limited federal oversight. *Id.* § 2710(d).

¶ 6 The tribal-state compact may allocate responsibility for gaming standards and regulation between the Indian tribe and the state, provide for licensing, specify the application of tribal or state criminal and civil laws, allocate law enforcement jurisdiction, authorize state assessments necessary to defer costs of state regulation, and authorize tribal taxation comparable to state taxation. *Id.* § 2710(d)(3)(C). States that allow class III gaming for any purpose by any person, organization or entity are required to negotiate the terms of a tribal-state compact in good faith when requested by an Indian tribe. *Id.* § 2710(d)(3)(A). An Indian tribe entering into a tribal-state compact retains the right "to regulate class III gaming on its Indian lands concurrently with the State" but the regulation cannot be "inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal–State compact." *Id.* § 2710(d)(5). Indian gaming must be conducted consistent with IGRA, or state law will govern the Indian gaming.[6] 18 U.S.C. § 1166.

¶ 7 Rather than set aside state interests in Indian-country gaming activities catering to the state's residents and visitors, IGRA authorizes the extension of state law over class III gaming activities in Indian country.[7] Rather than set aside the rights of Oklahoma's residents and visitors to state-law protections while they patronize an Indian casino, IGRA allows the casino patrons to retain their state-law protections as provided in the tribal-state compact. There is no language in IGRA that prohibits the extension of state court jurisdiction over a tort claim arising out of activity at a tribal casino against the Indian tribe or its casino. Fur-

5. IGRA provided a statutory basis for the operation and regulation of gaming by Indian tribes and for the adoption of federal standards for gaming on Indian lands, 25 U.S.C. § 2702; creating the National Indian Gaming Commission within the Department of Interior, *id.* § 2704, to monitor class II gaming and to approve tribal ordinances and tribal management contracts for class II and class III gaming, *id.* § 2706, and establishing a tribal-state compact system. *Id.* § 2710.

6. 18 U.S.C. § 1166 imposed state gambling law, including the licensing, regulation, or prohibition of gambling, into Indian country in the same

manner and to the same extent elsewhere in the state; left jurisdiction with the United States to prosecute violations of the state gambling laws unless the Indian tribe consents to state jurisdiction; and excepted gaming conducted in compliance with IGRA from the blanket imposition of state gambling law.

7. It was Congress' intent in IGRA to make use of the existing state regulatory systems because there was no adequate federal regulatory system for class III gaming. S.Rep. No. 100–446, at 13–14, reprinted in 1988 U.S.C.C.A.N. 3071, 3083–84.

ther, as the majority finds, there is no language in IGRA that explicitly or implicitly extends tribal court jurisdiction over nonconsenting casino patrons.

¶ 8 State Question No. 712, Legislative Referendum No. 335, the State–Tribal Gaming Act, codified at 3A O.S.Supp.2004, §§ 261–281, was approved by a vote of the people on November 2, 2004. The State–Tribal Gaming Act authorizes the operation of gaming machines at horse race tracks and on Indian lands. It provides a Model Tribal Gaming Compact (gaming compact) which Indian tribes may enter into and operate the gaming machines on Indian lands subject to oversight by the Office of State Finance, the designated state compliance agency (SCA). *Id.* § 281. The gaming compact is offered to the Indian tribes of Oklahoma, which if accepted, constitutes the gaming compact between this state and the accepting tribe for purposes of IGRA without any further action on behalf of the State of Oklahoma. *Id.* § 280.

¶ 9 The gaming compact recognizes an Indian tribe's liability for tort claims. Part 6(A)(1) of the gaming compact requires the Indian enterprise, defined as the tribe or tribal agency in Part 3(13), to maintain public liability insurance for the express purpose of covering and satisfying tort claims in the minimum amounts of 250,000 dollars for any one person, two million dollars for any one occurrence for personal injury, and one million dollars for any one occurrence for property damage or the corresponding limits under the Governmental Tort Claims Act, whichever is greater. The Governmental Tort Claims Act, 51 O.S.2001, §§ 151–170, is this state's law that waives the state's and its political subdivisions' governmental immunity for tort claims. Part 6(A)(3) of the gaming compact specifically provides that tribal sovereign immunity will not be invoked by casino insurers up to the liability limits.

¶ 10 The gaming compact provides for notice of tort claims to the tribal compliance agency (TCA) or the tribal enterprise for investigation and approval or denial. It also specifically declares that the tribe consents to suit on tort claims. Part 6(A)(2) states that the "tribe consents to suit on a limited basis with respect to tort claims subject to the limitations set forth in this subsection" and further states that "[n]o consents to suit with respect to tort claims, or as to any other claims against the tribe shall be deemed to have been made under this Compact, except as provided in subsections B and C of this Part." Part 6(A)(9) declares that "[a] judicial proceeding for any cause arising from a tort claim may be maintained in accordance with and subject to the limitations of subsection C of this part" under specified circumstances. This language in the gaming compact is far too plain for an Indian tribe to deny that it consents to suit on Indian-country arising tort claims at its casino.

¶ 11 The gaming compact provides for the State of Oklahoma to monitor class III gaming casinos through the SCA.[8] At Part 8(C), the SCA is required to report to the TCA "all pertinent, nonconfidential information regarding any violation of federal, state, or tribal laws, the rules and regulations, or this Compact." Part 8(C) effectively acknowledges that state law applies to activity related to class III gaming operations in Indian country, and there is no language indicating otherwise.[9] Application of state law is fur-

8. Likewise, IGRA uses "monitoring" in describing the powers of the National Indian Gaming Commission that regulates and oversees the tribal regulation of class II gaming. 25 U.S.C. § 2706(b).

9. The Ballot Title in the legislative referendum proposing enactment of State–Tribal Gaming Act did not indicate that Oklahoma law would not apply to Indian-country gaming. It read as follows:

This measure creates the State–Tribal Gaming Act. It would allow some types of gaming machines at some horse race tracks in this state. The Oklahoma Horse Racing Commis-

sion would oversee the new types of gaming machines. It would require that a portion of the money wagered on such gaming be paid to the state. Some of the money would go to purses for horse races. Some of the money would go to the horse race tracks. The measure also provides a model compact which Indian tribes may enter into and then operate such gaming machines on Indian lands. The model compact provides regulatory controls for the gaming authorized by the compact. The Office of State Finance would have the authority to oversee this gaming by the tribes. The money wagered on gaming would go to horse race tracks, purses for horse races, and the tribes.

ther acknowledged in Part 8(D) which limits the SCA's monitoring so as not to regulate the tribe's government or interfere with the tribe's selection of its governmental officers.

¶ 12 The dissenting opinion, at least implicitly, denies that the gaming compact is a law of Oklahoma. The compact is part of a legislative referendum that was approved by the Oklahoma Legislature, signed by the Governor, and approved by a vote of the people, both Indian and non-Indian registered Oklahoma voters. Once enacted through the exercise of this state's legislative power, the model class III gaming compact is a state statute—a law in this state. The terms of the gaming compact became fixed by state statute and are not negotiable.[10]

¶ 13 The dissent refers to the statutory gaming compact as a mutual agreement rather than a statute because of the recital in Part 2(3) that the "state and the tribe maintain a government-to-government relationship, and this Compact will help foster mutual respect and understanding among Indians and non-Indians." This recital undeniably expresses legislative intent to respect another recital in Part 2(1) that the "tribe is a federally recognized tribal government possessing sovereign powers and the rights of self-government." It also undeniably supports the disclaimer in Part 8(D) that "[n]othing in this Compact shall be deemed to authorize the state to regulate the tribe's government, including the TCA, or to interfere in any way with the tribe's selection of its governmental officers, including members of the TCA." But, it does not remove the gaming compact from the general statutory laws of the State of Oklahoma.

¶ 14 The dissent characterizes the Indian tribe's consent to suit as a waiver of tribal immunity. According to this dissent, the Indian tribe, in the gaming compact, waived tribal sovereign immunity, but the tribe did not agree to allocate civil jurisdiction to the state for tort claims. The gaming compact does not speak in terms waiver of tribal immunity.[11] The gaming compact provides, in precise words, that the Indian tribe "consents to suit," at Part 6(A)(2), in a "judicial proceeding for any cause arising from a tort claim," at Part 6(A)(9), "in a court of competent jurisdiction," at Part 6(C)(1). This consent to suit effectively designates that both the state and federal courts may exercise their jurisdiction over tort claims against the Indian tribe. This is so because of the well-established meaning of "court of competent jurisdiction."

¶ 15 "Competent jurisdiction" usually refers to a court's subject-matter jurisdiction, its authority to hear a given type of case, that is, the power vested in the court—by the

---

The state's portion of the money from the gaming authorized by this act would go for treatment of compulsive gambling disorders, to the Education Reform Revolving Fund and for college scholarships.
2004 Okla.Sess.Laws, ch. 316.

10. Oklahoma negotiated the terms of the gaming compact with the Indian tribes but those negotiations have not been preserved as the history of the statutory gaming compact. Oklahoma has no system for preserving legislative history like the federal congressional system of receiving information and recommendations submitted in congressional hearings and reporting on bills such as the legislative history of Public Law 100–446 in S. Rep No. 100–446, reprinted in 1988 U.S.C.C.A.N.

11. The gaming compact mentions tribal sovereign immunity in Part 6(A)(3), requiring that the Tribe's public liability insurance policy to "include an endorsement providing that the insurer may not invoke tribal sovereign immunity in connection with any claim made within the limit

of liability if the claim complies with the limited consent provisions of subsection C of this Part." The gaming compact does not contain language that would recognize an Indian tribe is clothed with inherent tribal sovereignty that gives rise to tribal immunity from suit when it engages in gambling-related activities.

In 2000, Congress expressed its opinion on tribal immunity and contracts. Reacting to the decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), Congress amended 25 U.S.C. § 81 to require the Secretary of the Interior **to refuse to approve an Indian land-related contract that does not disclose the tribe's claim to tribal sovereign immunity.** Pub.L. 106–179 (2000), 114 Stat. 46. Senate Report 106–150 (1999) indicates that Congress did not attempt to reconcile the divergent views of tribal immunity expressed in the majority opinion and the dissenting opinion. The Senate reported, at p. 9, that "Indian tribes and their contracting partners are generally best served if questions of immunity are addressed, resolved, or at least disclosed when a contract is executed."

law of its creation—to pass upon the subject matter of the suit. *Pennoyer v. Neff,* 95 U.S. 714, 733, 24 L.Ed. 565 (1878); *In re A.N.O.,* 2004 OK 33, ¶ 19, 91 P.3d 646, 649. Both federal and state laws utilize the phrase "court of competent jurisdiction." [12] : The phrase "court of competent jurisdiction" as used in federal statutes has long been construed to mean federal and state courts. *Blackburn v. Portland Gold Mining Co.,* 175 U.S. 571, 579, 20 S.Ct. 222, 225, 44 L.Ed. 276 (1900); *Shoshone Mining Co. v. Rutter,* 177 U.S. 505, 506, 20 S.Ct. 726, 44 L.Ed. 864 (1900). Under these authorities, the phrase "court of competent jurisdiction" in the gaming compact is a designation of state and federal courts. Accordingly, the effect of the phrase "court of competent jurisdiction" is to allocate the adjudication of tort claims against Indian tribes related to the operation of tribal gaming activities to the concurrent jurisdiction of the state and federal courts in accordance with 25 U.S.C.2001, § 2710(d)(3)(C)(ii) and (vii).

¶ 16 The dissent also takes the position that the gaming compact does not expressly extend Oklahoma tort law into the land of the Cherokee Nation and that Part 6(D) reflects intent that tribal tort law is the applicable tort law. As the dissent points out in footnote 3, Part 6(D) deals with collecting damages on a tort claim when the Indian tribe has failed to maintain the minimum required public liability insurance. Part 6(D) requires the Indian tribe to inform both the claimant and the state of any notice and hearing on a claim "to cover any award that might be made within the limits set forth in paragraph 1 of subsection A of this part." Part 6(D) is not a choice-of-substantive-tort-law provision. It is a post-judgment remedy for collecting a money judgment on a tort claim against an uninsured Indian tribe.

¶ 17 The right to damages to compensate the plaintiff for injuries caused by a violation of his or her legal rights is the basis for classifying a wrong as a "tort." An action for damages is an essential characteristic of a "tort." *United States v. Burke,* 504 U.S. 229, 235, 112 S.Ct. 1867, 1871, 119 L.Ed.2d 34 (1992). In federal jurisprudence, a tort is "a civil wrong, other than a breach of contract, for which the court will provide a remedy in the form of an action for damages." *Id,* 504 U.S. at 234, 112 S.Ct. at 1870–1871. Similarly, the Oklahoma Governmental Tort Claims Act defines "tort" as "a legal wrong, independent of contract, involving violation of a duty imposed by general law or otherwise, resulting in a loss to any person, association or corporation as the proximate result of an act or omission of a political subdivision or the state or an employee acting within the scope of employment." 51 O.S.2001, § 152(11). Nothing in Part 6(D) would withhold the common law "tort" action for damages from those injured at an Indian casino. Notwithstanding, this dissent seems to advocate that the Indian tribe agreed to a system of tort liability that does not include a common law tort suit for damages.

¶ 18 The dissent relies on Part 9—"This compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction."— for the proposition that the tribal court is the only court with jurisdiction over the Indian tribe's activity on its tribal land. When the Legislature passed the referendum to send the State–Tribal Gaming Act to a vote of the people in 2004, three overarching principles determined the civil jurisdiction of a tribal court over alleged tortious injury to a non-tribal-member in Indian country: 1) the jurisdiction of the tribal court does not extend to non-members who come onto tribal land except as may be necessary to preserve the Indian tribe's right to self-governance or its right to control its internal relations, *Montana v. U.S.,* 450 U.S. at 564, 101 S.Ct. at 1258–1259; 2) tribal courts are not courts of general jurisdiction, *Nevada v. Hicks,* 533 U.S. at 367, 121 S.Ct. at 2304 (2001), and 3)

---

12. See Okla. Const., art. VIII, § 1(requiring that elected state officers shall automatically be suspended upon their being declared guilty of a felony by a **court of competent jurisdiction**); 51 O.S.2001, § 152(1) (the state governmental tort claims law defining "action" as a proceeding in a **court of competent jurisdiction** by which one party brings a suit against another); 15 U.S.C. § 3007 (providing for jurisdiction over civil action involving interstate horse racing in the federal district court in the host state or the off-track state concurrent with that of any state **court of competent jurisdiction** located in the host state or the off-track state).

an Indian tribe's attempt to exercise civil authority over activities of nonmembers is presumptively invalid. *Atkinson Trading Co., Inc. v. Shirley,* 532 U.S. 645, 659 121 S.Ct. 1825, 1835, 149 L.Ed.2d 889 (2001). The language in Part 9 safeguards these Indian law principles, but it does not diminish the unequivocal consent to suit on a tort claim against the Indian tribe or its casino in a court of competent jurisdiction in Part 6.

¶ 19 Finally, the dissent argues that the gaming compact deals solely with the liability of the Indian tribe and that it does not alter rights or remedies between private parties. This contention implies that casino patrons retain their common law tort rights and remedies and that Oklahoma's tort law follows persons into Indian country and governs the gambling-related activity of all persons and entities in Indian country except the Indian tribe. This contention essentially argues for tribal immunity from damages caused by tribal tortious gambling-related activities. Application of the doctrine of tribal immunity requires a pre-emption analysis against a backdrop of a tradition of tribal sovereignty that gives rise to tribal immunity. *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983). There was no class III gambling in Indian country until the ruling in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), and the enactment of IGRA. Just as *Rice v. Rehner* concluded that there is no tradition of tribal sovereignty in governing activity related to alcoholic beverages, there is no tradition of tribal sovereignty in governing activity related to class III gambling. Both are vice activities traditionally controlled through the states' police power for the protection of the public health and welfare. *See Greater New Orleans Broadcasting Ass'n v. United States,* 527 U.S. 173, 182, 119 S.Ct. 1923, 1929, 144 L.Ed.2d 161 (1999); *Artichoke Joe's California Grand Casino v. Norton,* 353 F.3d 712 (9th Cir. 2003); *Bittle v. Bahe,* 2008 OK 10, ¶ 35, n. 15, 192 P.3d 810, 823, n. 15. Similar to the authority delegated to the states and the Indian tribes over alcoholic beverages in 18 U.S.C. § 1161, IGRA delegated authority over class III gaming in Indian country to the states and the Indian tribes to be exer-

cised through a tribal-state compact system. 25 U.S.C. § 2710(d). In Oklahoma's statutory model tribal gaming compact, the Indian tribes consent to be sued for damages resulting from a tribe's tortious activity related to the operation of its gambling casino and nothing in the compact alters the common law rights and remedies available to casino patrons under Oklahoma law.

¶ 20 The issue decided today touches upon the rights and remedies of casino patrons and the accountability of casino operators. Indian casinos are vigorously marketed to non-Indian patrons in this and surrounding states. In an August of 2007 publication, the Cherokee Nation reported that in 1992 it had one gaming facility with 86 employees; and by 2006, those number skyrocketed to nine gaming facilities with more than two thousand employees and at least ten gaming-facility-related golf clubs, hotels and convenience stores with more than one thousand employees. These are the numbers for only one of the more than thirty federally recognized Indian tribes in Oklahoma. The importance of this issue cannot be underestimated. The majority opinion properly construes "court of competent jurisdiction" as used in our statute under state law and consistent with the federal law. Oklahoma courts are competent to adjudicate tort claims against Indian tribes under the state Model Tribal Gaming Compact and the federal Indian Gaming Regulatory Act did not pre-empt state law.

COLBERT, J., concurring specially.

¶ 1 I concur in today's pronouncement that the District Court of the State of Oklahoma is "a court of competent jurisdiction," as that term is used in the gaming compact between the Cherokee Nation and the State of Oklahoma, for the adjudication of a patron's claim against the tribal enterprise for personal injury suffered on the premises of the tribe's casino operated on tribal land. I write separately to articulate the rationale underlying my agreement with that result.

¶ 2 As a matter of black-letter law, "Indian tribes are immune from lawsuit or court process in both state and federal court unless

'Congress has authorized the suit or the tribe has waived its immunity.'" Felix S. Cohen, *Cohen's Handbook of Federal Indian Law*, 635 (Nell Jessup Newton et al. eds., Lexis-Nexis Matthew Bender rev. ed.2005)[hereinafter *Cohen 2005 Handbook* ](quoting *Kiowa Tribe v. Mfg. Technologies, Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998)); *See also Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890–891, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986); *Puyallup Tribe v. Dep't of Game*, 433 U.S. 165, 172–173, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). A tribe's sovereign immunity extends to its commercial as well as governmental activities. *Kiowa Tribe*, 523 U.S. at 759, 118 S.Ct. 1700. "Tribal sovereign immunity protects a tribal corporation owned by a tribe and created under its own laws, absent express waiver of immunity by the tribe or Congressional abrogation." *Wright v. Colville Tribal Ent. Corp.*, 159 Wash.2d 108, 147 P.3d 1275, 1278 (2006)(citing *Kiowa Tribe*, 523 U.S. at 754, 118 S.Ct. 1700). State judicial jurisdiction over Indian tribes and tribal members in Indian country is generally precluded in the absence of express authorization by treaty or by Congress. *Cohen 2005 Handbook* at 521. "Indian country includes 'all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments.'" *Id.* at 520 (quoting *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 125, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993)).

¶ 3 Congress enacted the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721; 18 U.S.C. 1166–1168 (2000), "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Congress has "partially abrogated the immunity of Indian tribes in the Indian Gaming Regulatory Act, but *only* for suits brought *by states* to enjoin a Class III gaming activity conducted in violation of a

tribal-state compact between the tribe and the state pursuant to the Act." *Cohen 2005 Handbook* at 639 (citing 25 U.S.C. § 2710(d)(7)(ii)) (emphasis added). Although Congress has not abrogated the sovereign immunity of Indian tribes for patron injuries occurring at tribe-owned casinos in Indian country, it has authorized the states and the tribes to enter into gaming compacts. IGRA authorizes such compacts and lists a variety of subjects which may be negotiated, including "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). As the New Mexico Supreme Court determined in *Doe v. Santa Clara Pueblo*, 141 N.M. 269, 154 P.3d 644 (2007), IGRA's grant of authority was sufficient to permit a tribe's partial waiver of sovereign immunity and to permit the parties to establish concurrent jurisdiction by providing that personal injury claims could "proceed either in binding arbitration ... or in a court of competent jurisdiction" and by defining a "court of competent jurisdiction" to include state courts. *Id.* at 647. In the New Mexico compact, the tribe "expressly agreed that state tort law would apply to personal injury suits against casinos arising on [tribal] lands." *Id.* at 648 n. 3.

¶ 4 "Congress envisioned, and authorized, tribes to contract for jurisdiction shifting, if they wished, as part of a much larger, global settlement of complex issues that was necessary to make tribal Gaming work." *Id.* at 656. Congress, however, merely authorized such provisions, the compacting parties remained free to refrain from making such choices in a gaming compact. "Nothing in IGRA required the tribes to negotiate the subject, nor does anything in IGRA prevent them from doing so." *Id.* at 657. Therefore, any authority for the District Court of Oklahoma to entertain a suit against a tribal enterprise for a patron's injury *must* be found in the terms of a congressionally authorized gaming compact entered into pursuant to IGRA.[1]

---

1. There is no basis for state court jurisdiction over this matter outside the provisions of the Compact. Oklahoma is not a Public Law 280 state and the tribe has not consented to civil regulatory jurisdiction pursuant to 25 U.S.C. 1322.

The patron in this matter has cited cases which, he asserts, prohibit the tribal courts from exercising jurisdiction over a nonmember pa-

¶ 5 "A compact is a negotiated agreement between two governments." *Cohen 2005 Handbook* at 589 n. 632. Although this Compact's provisions are those of the model gaming compact, codified in the Oklahoma Statutes, the Compact is not derived from state law. *See* Model Tribal Gaming Compact, Okla. Stat. tit. 3A, § 281 (Supp.2004). It is "a contract, subject to construction and application in accordance with its terms." *Texas v. New Mexico*, 482 U.S. 124, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987). As in any issue of contract construction, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." Okla. Stat. tit. 15, § 152 (2001). "A fundamental precept of contract law in Oklahoma is that the law will not make a better contract than the parties themselves entered." *Roye Realty & Developing, Inc. v. Watson*, 1996 OK 93, ¶ 33, 2 P.3d 320, 329. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others." Okla. Stat. tit. 15, § 157.

¶ 6 Proper construction of this Compact requires an acknowledgment that the two sovereign governments were acutely aware that "[t]ribal courts' jurisdiction to adjudicate matters arising in Indian country is broad, encompassing all civil and criminal matters absent limitations imposed by lawful federal authority." *Cohen 2005 Handbook* at 217. The parties expressed their intent that the tribal, federal, and state governments retain their respective spheres of civil adjudicatory and criminal jurisdiction over gaming in Indian country by providing in Part 9: "This Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." Had the parties made no provision for patron tort claims, jurisdiction over such claims against the tribal enterprise would have remained exclusively within the jurisdiction of the tribal court and the claim would be subject to the tribe's sovereign immunity defense. However, the parties made specific and extensive provisions for such claims in Part 6 of the Compact and in doing so allocated jurisdiction, but *only* as to the third-party tort claims of patrons.

¶ 7 By this Compact, the tribe waived its immunity from liability for patron tort claims, but only to specified limits of liability insurance coverage or the "corresponding limits under [Oklahoma's] Governmental Tort Claims Act [GTCA, Okla. Stat. tit. 51, §§ 151–200 (2001 & Supp.2007) ] whichever is greater." By simply mirroring the liability limits and certain other provisions of the GTCA, the parties did not agree that Oklahoma law applies to patron tort claims. Rather, the parties set out specific procedures and provisions for the "just and reasonable compensation for a tort claim." Without more, the limits of tribal liability stated in the Compact would have merely limited sovereign immunity in the tribal court, but the Compact's provisions for patron tort claims went further to allocate the forum in which such claims were to be adjudicated.

¶ 8 The parties did not specify, as they certainly could, that only the tribal court or only the state court would adjudicate the claims. Instead, the tribe granted its consent to jurisdiction in "a court of competent jurisdiction" for the limited purpose of the adjudication of such claims. The Compact did not specify whether the parties consid-

tron. Patron is addressing the wrong question. The question is not whether the tribal court may exercise legislative or civil adjudicatory jurisdiction over a casino patron, whose passive role in this matter is alleged to be that of a tort victim. The cited cases are inapplicable because they concern a tribe's or a tribal court's authority over non-Indians. *See Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001)(tribes lack regulatory or civil adjudicatory jurisdiction over state officials searching tribal member's on-reservation property for evidence of alleged off-reservation violation of state law); *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997)(tribe may not exercise civil adjudicatory jurisdiction over civil case between two non-Indians arising from on-reservation automobile accident); *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)(concerned the authority of tribe to regulate hunting and fishing by nonmembers of tribe on non-Indian owned lands within a reservation). The question in this matter is whether the state district court has acquired civil adjudicatory authority over the conduct of the tribal enterprise by virtue of the provisions of the congressionally authorized gaming Compact which the parties negotiated.

ered state district court to be a "court of competent jurisdiction." The intent to permit adjudication of patron tort claims in state court, however, is demonstrated by the provisions of the Compact.

¶ 9 By not selecting existing law and by not selecting a particular forum, the parties granted concurrent jurisdiction to tribal and state courts for the adjudication of patron tort claims against the tribal enterprise. The tribe's "limited consent to suit" in "a court of competent jurisdiction" would not have been necessary if concurrent jurisdiction were not intended because, absent the Compact, claims based on the activity of a tribe in Indian country would belong exclusively within the jurisdiction of the tribal court system. There would have been no need for the tribe to consent to a jurisdiction which it already possessed. Conversely, if the parties had intended patron tort claims to be adjudicated exclusively in state court, the parties could have so provided.

¶ 10 The tribe has expressly and unequivocally waived its immunity from suit for patron tort claims in a judicial forum, whether it be state or tribal. The failure of the parties to define the term "a court of competent jurisdiction" in the Compact does not make the waiver of suit immunity equivocal or unclear. The failure to expressly specify that state courts are included in the term does not invalidate the waiver. The United States Supreme Court made that clear in its unanimous decision in *C & L Enterprises v. Citizen Band of Potawatomi Indian Tribe,* 532 U.S. 411, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001).

¶ 11 In *C & L,* the Court considered what constitutes a valid waiver of a tribe's immunity from suit. The construction contract at issue, which the tribe had entered to obtain a new roof on a building it owned outside Indian country, included an arbitration clause and a choice-of-law provision. *Id.* at 415, 121 S.Ct. 1589. The Court found a valid waiver of immunity from suit in the tribe's consent to binding arbitration and enforcement of an arbitration award in "any court having jurisdiction thereof." *Id.* at 419, 121 S.Ct. 1589. The Court rejected the tribes assertion that "[n]o court—federal, state, or even tribal—

ha[d] jurisdiction over C & L's suit … because [the tribe] has not expressly waived its sovereign immunity in any judicial forum" *Id.* at 421, 121 S.Ct. 1589. Because the parties chose Oklahoma law, Oklahoma's Uniform Arbitration Act applied which designated enforcement in the "court[s] of competent jurisdiction of [Oklahoma]." *Id.* at 420, 121 S.Ct. 1589.

¶ 12 In this matter, the parties to the Compact did not choose the applicable law. Instead, they set out the dollar limits of a tribe's liability for a patron's tort claim brought in a court of competent jurisdiction. Therefore, the tribe's limited waiver of immunity from suit, unlike the waiver in *C & L,* did not completely allocate jurisdiction to the state court. Rather, by not choosing between state law and tribal law, the parties brought patron tort claims under the jurisdiction of state courts and under the jurisdiction of tribal courts.

¶ 13 The Compact provides for concurrent jurisdiction in tribal or state court for the adjudication of patron tort claims against the tribal enterprise. Therefore, the patron in this matter was entitled to have his claim adjudicated under the Compact provisions in the forum he chose. The trial court did not err by determining that it had jurisdiction to hear this claim.

KAUGER, J., with whom EDMONDSON, C.J., joins, concurring in part/dissenting in part:

¶ 1 I agree with some of the majority's statements of the law, and I concur in remanding the cause, but not for the reasons expressed by the majority. The dispositive question is whether tort claim jurisdiction belongs exclusively or concurrently in state or tribal court when a non-tribal member falls off a chair at a Cherokee casino. The answer depends on several factors.

¶ 2 Indian law does not afford a "one-size-fits-all" solution. Jurisdiction depends on: 1) the choice of court, if any, negotiated under the gaming compact; 2) the *status quo* in the absence of a designated court; and 3) whether the state has accepted jurisdiction under

P.L. 280, as well as the existence and proficiency of a tribal court system.

¶ 3 There are, based on the facts presented, at least three jurisdictional options: federal, state or tribal court. The dispositive question in this cause is not merely whether the District Court of Rogers County was intended to be a court of competent jurisdiction as that term is used in the Compact between the Cherokee Nation and the State of Oklahoma. Beyond that is the more basic question—whether a tort claim asserted by a non-tribal member arising from events occurring at a tribal gaming enterprise on tribal land "belongs" [1] exclusively or concurrently in state court, tribal court, or federal court.[2]

## I.

### THE CHOICE OF COURT, IF ANY, NEGOTIATED UNDER THE GAMING COMPACT.

¶ 4 Congress, through the enactment of the Indian Gaming Regulatory Act (IGRA),[3] made provisions for Tribes to negotiate gaming compacts with States for Class III gaming. Here, the Compact is based on the Model Tribal Gaming Compact found at 3A O.S. Supp.2004 § 281, a part of the State–Tribal Gaming Act.[4] These statutes were enacted to allow the state to enter into a compact with other sovereign entities—the Oklahoma Tribes. Prior to the compact, they stood on equal footing—*at least in relation to Class III gaming*.

¶ 5 The United States Constitution recognizes that Indian Tribes are to be treated on an equal level with the governments of foreign nations as well as the states. Art. 1, § 8 of the United States Constitution provides that "[t]he Congress shall have the power to ... regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Oklahoma Constitution recognizes that all tribal lands lying within Oklahoma boundaries shall be subject to the jurisdiction of the United States.[5]

¶ 6 It has been consistently recognized that Indian Tribes possess the same com-

---

1. Use of the word "belong" refers to jurisdiction, as in which Court (federal, state, or tribal) properly has subject matter jurisdiction to decide the tort claim.

2. Title 25 U.S.C. § 2710(d)(7) creates federal jurisdiction in some circumstances. It provides in pertinent part:

   (7) (A) The United States district courts shall have jurisdiction over—
   (i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal–State compact under paragraph (3) or to conduct such negotiations in good faith,
   (ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact entered into under paragraph (3) that is in effect, and
   (iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).
   (B) (i) An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180–day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).
   (ii) In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that—

   (I) a Tribal–State compact has not been entered into under paragraph (3), and
   (II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith, the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal–State compact governing the conduct of gaming activities. . . .
   However, in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996), the United States Supreme Court held that a state may not be sued in federal court for failure to negotiate in good faith.

3. The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, governs Indian gaming within the states.

4. Title 3A O.S. Supp.2004 §§ 261–282.

5. Art. 1, § 3 of the Oklahoma Constitution provides in pertinent part:

   . The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. . . .

mon-law immunity from suit traditionally enjoyed by sovereign powers,[6] and that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed.[7] Within the last month, *Native American Distributing v. Seneca–Cayuga Tobacco Co.*, 546 F.3d 1288 (10th Cir.2008) held that sovereign immunity extended to a corporate enterprise of the tribe. The 10th Circuit reiterated that suits against Indian Tribes are barred absent an express, clear waiver in writing by the tribe or by congressional abrogation.[8]

¶ 7 Various treaties have recognized the status of tribal governments and their inherent jurisdiction over matters occurring within their boundaries.[9] Even the controversial Treaty of New Echota signed by the officials of the United States Government and members of the Cherokee Nation on December 29, 1835, secured to the Cherokee Nation the right to govern themselves.[10] The Oklahoma Legislature has also explicitly recognized the unique status of Indian Tribes,[11] and created the joint committee on State–Tribal Rela-

6. See also, *C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418, 121 S.Ct. 1589, 1594, 149 L.Ed.2d 623 (2001); *Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Tribal Immunity is a matter of federal law and is not subject to diminution by the States. *Hoover v. Kiowa Tribe of Oklahoma*, 1999 OK 61, ¶ 5, 986 P.2d 516. Congress must 'unequivocally' express the abrogation of tribal immunity, and a tribe's waiver must be 'clear.' *C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Okla.*, supra. Common-law sovereign immunity possessed by an Indian tribe is necessary corollary to Indian sovereignty and self-governance. *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering*, 476 U.S. 877, 891, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986). Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe. *Puyallup Tribe, Inc. v. Department of Game State of Wash.*, 433 U.S. 165, 172, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977).

7. *C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, see note 6 supra; *Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, see note 6, supra; *Santa Clara Pueblo v. Martinez*, see note 6, supra.

8. *C & L Enterprises, Inc. v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, see note 6, supra; *Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*, see note 6, supra; *Santa Clara Pueblo v. Martinez*, see note 6, supra.

9. For example, the Treaty of Dancing Rabbit Creek, signed on September 27, 1830 between the Choctaw tribe and the United States Government in which the tribe ceded land in Mississippi in exchange for land in Indian Territory provided in Article IV that "[t]he Government and people of the United States are hereby obligated to secure to the said Choctaw Nation of Red People the jurisdiction and government of all the persons and property that my be within their limits

west, so that no Territory or state shall ever have a right to pass laws for the government of the Choctaw Nation of Red People and their descendants." Kappler, Charles (1904). "Indian Affairs: Laws and Treaties Vol. II, Treaties." (HTML). Government Printing Office. Retrieved on 10/23/2008.

10. In the treaty, the Cherokee Nation ceded their lands east of the Mississippi in exchange for $5 million dollars and lands in Indian Territory. Article 5 of the Treaty of New Echota provides:

The United States hereby covenant and agree that the lands ceded to the Cherokee nation in the forgoing article shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them: provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they stall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the Government of the same.

Kappler, Charles (1904). "Indian Affairs: Laws and Treaties Vol. II, Treaties." (HTML). Government Printing Office. Retrieved on 10/28/2008.

11. Title 74 O.S.2001 § 1221 provides in pertinent part:

A. The State of Oklahoma acknowledges federal recognition of Indian Tribes recognized by the Department of Interior, Bureau of Indian Affairs.
B. The State of Oklahoma recognizes the unique status of Indian Tribes within the federal government and shall work in a spirit of cooperation with all federally recognized Indi-

tions to oversee agreements between the Tribes and the State.[12]

¶ 8 Congress allowed States and Tribes to include agreements of allocation of jurisdiction in gaming compacts.[13] The Compact refers to "court of competent jurisdiction" in part 6 under the heading "TORT CLAIMS; PRIZE CLAIMS; LIMITED CONSENT TO SUIT." This provision of the compact relates to tort claims and it sets forth limitations of liability, requirements for asserting tort claims, procedures, etc. in a manner very similar to the Oklahoma's Governmental Tort Claims Act[14]—an act allowing tort claims to be brought against the State.

¶ 9 Subsection C of part 6 of the Compact contains an agreement of the Tribe to consent to being sued for tort claims associated/arising out of its gaming operations. It provides in part:

> an Tribes in furtherance of federal policy for the benefit of both the State of Oklahoma and Tribal Governments.
> C. 1. The Governor, or named designee, is authorized to negotiate and enter into cooperative agreements on behalf of this state with federally recognized Indian Tribal Governments within this state to address issues of mutual interest. Except as otherwise provided by this subsection, such agreements shall become effective upon approval by the Joint Committee on State–Tribal Relations. . . .

12. Title 74 O.S.2001 § 1222 provides in pertinent part:

> A. There is hereby created the "Joint Committee on State–Tribal Relations". The Committee shall be responsible for overseeing and approving agreements between tribal governments and the State of Oklahoma. The Committee shall consist of ten (10) members, to be appointed as follows:
> 1. Five members of the Senate to be appointed by the President Pro Tempore of the Senate; and
> 2. Five members of the House of Representatives to be appointed by the Speaker of the House of Representatives. . . .

13. Section 2710(d)(3)(C) of the Indian Regulatory Gaming Act provides:

> (C) Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to—
> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

Limited Consent to Suit for Tort Claims and Prize Claims. The tribe consents to suit against the enterprise in a court of competent jurisdiction with respect to a tort claim or prize claim if all requirements of paragraph 9 of subsection A or all requirements of paragraph 11 of subsection B of this Part have been met; provided that such consent shall be subject to the following additional conditions and limitations: . . . .

Exactly like the Oklahoma Governmental Tort Claims Act, were it not for this compact, no tort action could be asserted against the Tribe or a Tribal enterprise. Where it is to be asserted is another question altogether.

¶ 10 For whatever reason, this Compact, as the majority opinion correctly notes, did not include provisions for jurisdiction shifting. Some other state tribal compacts have clearly included such provisions.[15] However, the

> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
> (v) remedies for breach of contract;
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
> (vii) any other subjects that are directly related to the operation of gaming activities.

14. Title 51 O.S.2001 §§ 151 et seq.

15. For example, in *Kizis v. Morse Diesel International,* 260 Conn. 46, 794 A.2d 498, 504 (2002), the Supreme Court of Connecticut, in discussing a compact between the State and the Mohegan Nation, quotes the compact. The Court recognizes that the compact explicitly places tort actions which occur on tribal land in the tribal court. The opinion provides in pertinent part:

> . . . Section 3(g) of the gaming compact provides: "The Tribe shall establish, prior to the commencement of class III gaming, reasonable procedures for the disposition of tort claims arising from alleged injuries to patrons of its gaming facilities. The Tribe shall not be deemed to have waived its sovereign immunity from suit with respect to such claims by virtue of any provision of this Compact, but may adopt a remedial system analogous to that available for similar claims arising against the State or such other remedial system as may be

Compact does provide in part 9 that: "[t]his compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction."

¶ 11 Although this is a novel question in Oklahoma, all of the other jurisdictions which have considered the issue have held that the Tribes have jurisdiction (some negotiated under the compact, some inherent).[16] Gaming

appropriate following consultation with the State gaming agency."

Pursuant to its obligation under the gaming compact, the Mohegan Tribal Council established, in the Constitution of the Mohegan Tribe of Indians of Connecticut, a Gaming Disputes Court and a Gaming Disputes Court of Appeals. Mohegan Const., art. XIII, § 2. These courts have jurisdiction over disputes "arising out of or in ... connection with" tribal gaming operations or the actions of the authority. Mohegan Const., art. XIII, § 2. The Mohegan constitution provides that "[t]he Tribal Council shall establish by ordinance, the Gaming Disputes Court, which shall be composed of a Trial Branch and an Appellate Branch. Exclusive jurisdiction for the Tribe over disputes arising out of or in connection with the Gaming, the actions of the Tribal Gaming Authority, or contracts entered into by The Mohegan Tribe or the Tribal Gaming Authority in connection with Gaming, including without limitation, disputes arising between any person or entity and the Tribal Gaming Authority, including customers, employees, or any gaming manager operating under a gaming management agreement with the Tribal Gaming Authority, or any person or entity which may be in privity with such persons or entities as to Gaming matters shall be vested in the Gaming Disputes Court...." Mohegan Const., art. XIII, § 2. In addition, the tribe ordinance establishing the Gaming Disputes Court confers "exclusive original jurisdiction over all cases with respect to which the Tribe has conferred subject matter jurisdiction pursuant to Article XIII of the Mohegan Constitution." Ordinance No. 95–4 of the Mohegan Tribe of Indians of Conn., art. V, § 501.

The tribe enacted an ordinance ... establishing the Mohegan Torts Code, which contains a limited waiver of the tribe's sovereign immunity so that the Gaming Disputes Court may adjudicate liability for "(1) [i]njuries proximately caused by the negligent acts or omissions of the Mohegan Tribal Gaming Authority; (2) [i]njuries proximately caused by the condition of any property of the Mohegan Tribal Gaming Authority provided*57 the claimant establishes that the property was in a dangerous condition; [and] (3) [i]njuries caused by the negligent acts or omissions of tribal security officers arising out of the performance of their duties during the course and within the scope of their employment." Ordinance No. 98–1, An Ordinance Amending Ordinance 96–2 Establishing* *505 The Mohegan Torts Code, § 3(c). The Mohegan Torts Code further provides that the ordinance does not immunize employees of the authority from individual liability, but that all disputes regarding employ-

ees that occur on the Mohegan "Gaming Enterprise Site shall be heard only in the Gaming Disputes Court." ... Ordinance No. 98–1, supra, § 6....

In Arizona, the Compact in Section 8 provides: Nothing in this Compact is intended to change, revise or modify the civil and criminal jurisdiction of the Tribe or of the State. Nothing contained herein shall be deemed to modify or limit existing federal jurisdiction over Indians and the Gaming Operations authorized under this Compact.

Section 13c addressed Tort Remedies for Patrons and it provides:
The Tribe shall establish written procedures for the disposition of tort claims arising from personal injury or property damage alleged to have been suffered by patrons and invitees of its Gaming Facilities and shall enact such Tribal law as is necessary to implement these procedures. The procedures shall include all time limits applicable to the disposition of the tort claim and a provision that, upon request, the patron or invitee, or the patron's or invitee's designated representative, shall be provided with a copy of the procedures as well as the name, address and telephone number of the Gaming Facility Operator and the mailing address and telephone number of the clerk of the Tribal court. The tribe shall not be deemed to have waived its sovereign immunity from suit with respect to such claims by establishing such procedures or by any provision of this Compact, but agrees not to assert such immunity as provided in subsection (d) of this Section.

In North Dakota, the Gaming Compact between the Cheyenne River Sioux Tribe and the State of North Dakota provides in subsection 6:
Any case in which a tribal member or an Indian non-member is a defendant shall be heard in tribal court. Any case in which a non-Indian is a defendant shall be heard in another court.
It is understood by the parties that the provisions of this paragraph are limited to civil cases arising from transactions related to or arising from gaming conducted in Dewey and Ziebach counties on the Cheyenne River Reservation pursuant to this compact. This provision shall not be construed to be a waiver of the sovereign immunity of the Cheyenne River Sioux Tribe.

16. *Hatcher v. Harrah's NC Casino Company, LLC.*, 169 N.C.App. 151, 610 S.E.2d 210 (2005); *Gallegos v. Pueblo of Tesuque*, 132 N.M. 207, 46 P.3d 668 (2002); *Doe v. Santa Clara Pueblo*, 141 N.M. 269, 154 P.3d 644, 646–647 (2007); *Diepenbrock v. Merkel*, 33 Kan.App.2d 97, 103, 97 P.3d 1063 (2004).

*Corporation of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir.1996), involved a lawsuit between a tribal casino management company and a law firm representing the Ho–Chunk Nation. The 8th Circuit held, after examining IGRA's legislative history, that IGRA completely preempted state law. Even though the lawsuit was not a tort claim brought by a casino patron, the Court's discussion of IGRA is illuminating here. The lawsuit was brought in federal court but dismissed by the court and remanded to state court. In discussing the issue of jurisdiction over gaming-related lawsuits, the *Dorsey* Court noted that "[T]he legislative history indicates that Congress did not intend to transfer any jurisdictional or regulatory power to the states by means of IGRA unless a tribe consented to such a transfer in a tribal-state compact." The Court also recognized that:

> Congress thus left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact. Tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes 'the permissible scope of a Tribal–State compact.'

¶ 12 It was within the parameters of IGRA for the parties to provide whether the state or tribal courts had jurisdiction over tort claims.[17] However, they did not do so. Instead, it appears that the State and Tribe agreed to leave things *status quo*. If this is not what is meant by the provision stating that the "compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction," then the phrase "court of competent jurisdiction" as used in the Compact is *at the very least*, ambiguous and the Court should remand the matter for a consideration of parol evidence to determine the parties' true intent.[18]

## II.

### THE *STATUS QUO* IN THE ABSENCE OF A DESIGNATED COURT.

¶ 13 In the absence of a jurisdiction-shifting agreement, the question becomes whether more than one court could assert jurisdiction over such disputes. Although the majority opinion ignores them, other courts have addressed the issue of which court should assert jurisdiction. Perhaps the most striking decision comes from the United States Supreme Court in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), a case involving a non-Indian insurer who sought a declaration in federal court that it had no duty to defend or indemnify an insured with respect to an incident which was the subject of suit against the insurer in tribal court. The Court deferred to the tribal court, allowing it the first opportunity to determine jurisdiction. In doing so, the Court noted that "Indian tribes retain attributes of sovereignty over both their members and their territory to the extent that sovereignty has not been withdrawn by federal statute or treaty."

¶ 14 The Court also recognized the significance of tribal courts. It said:

> ... We have repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government.... This policy reflects the fact that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' ... to the extent that sovereignty has not been withdrawn by federal statute or treaty. The federal policy favoring tribal self-government operates even in areas where state control has not been affirmatively pre-empted by federal statute. '[A]bsent governing Acts of Congress, the question has always been whether the state action

---

**17.** Title 25 U.S.C. § 2710(d)(3)(C), see note 13, supra.

**18.** Whether a contract is ambiguous and requires extrinsic evidence for clarification is a matter for the court to decide. *Campbell v. Independent*

*School District*, 2003 OK 73 ¶ 16, 77 P.3d 1034; *Pitco Production Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 12, 63 P.3d 541; *Lewis v. Sac and Fox Tribe of Oklahoma Housing Authority*, 1994 OK 20 ¶ 25, 896 P.2d 503.

infringed on the right of reservation Indians to make their own laws and be ruled by them.' ... Tribal courts play a vital role in tribal self-government, ... and the Federal Government has consistently encouraged their development.... Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, ... their civil jurisdiction is not similarly restricted.... If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law.... *Iowa Mutual Ins. Co. v. LaPlante,* supra at pp. 975–76, 107 S.Ct. 971. (Citations omitted.).

¶ 15 Other courts have recognized that the matter belongs foremost in Tribal Courts. For example, in *Hatcher v. Harrah's NC Casino Company, LLC.,* 169 N.C.App. 151, 610 S.E.2d 210 (2005), the North Carolina Court of Appeals addressed whether the state courts had subject matter jurisdiction to resolve a dispute between a casino patron who alleged that he won a jackpot and the casino's management company. The compact between the Tribe and the State granted regulatory, criminal jurisdiction to the State, but it did not expressly grant civil jurisdiction to the State with respect to the parties' dispute. The court concluded that the exercise of state court jurisdiction in the action would unduly infringe on the self-governance of the tribe.[19] It held at pp. 213–214 that:

> It is clear that the Eastern Band of Cherokee Indians has policies and procedures in place to resolve disputes such as the one plaintiff presents in the case *sub judice.* Thus, for our courts to exercise jurisdiction in this case would plainly interfere with the powers of self-government conferred upon the Eastern Band of Cherokee Indians and exercised through the Cherokee Tribal

Gaming Commission. [*Jackson County v. ]Swayney,* 319 N.C. [52] at 62, 352 S.E.2d [413] at 419 [ (1987) ] (quoting *Fisher v. District Court,* 424 U.S. 382, 387–88, 96 S.Ct. 943, 946–47, 47 L.Ed.2d 106, 112 (1976)). It would subject a dispute arising on the reservation between the casino and its patron to a forum other than the one the Indians have established for themselves. *Id.*

Whereas the Eastern Band of Cherokee Indians has a greater interest in resolving patron disputes related to activities within the casino, and has policies and procedures for resolving such disputes, the interests of the Indians outweigh the interests of the state. Therefore, the exercise of state court jurisdiction in the present case would unduly infringe on the self-governance of the Eastern Band of Cherokee Indians. For these reasons, we hold that our state courts must yield subject matter jurisdiction to the Eastern Band of Cherokee Indians in the case *sub judice* and affirm the decision of the trial court.

¶ 16 A New Mexico case, *Gallegos v. Pueblo of Tesuque,* 132 N.M. 207, 46 P.3d 668 (2002), dealt with the subject matter jurisdiction of state courts over a tort claim brought by a non-Indian against an Indian tribe for injuries suffered at the tribe's gaming facility. At the time of the alleged tort, there was no valid gaming compact in force. The Court held that trial courts of New Mexico lacked jurisdiction in the matter absent a valid agreement between the tribe and the state permitting the state court to hear the matter. *Doe v. Santa Clara Pueblo,* 141 N.M. 269, 154 P.3d 644, 646–647 (2007), was decided after a valid gaming compact had been executed between the tribe and the state. The compact contained specific language concerning tort claims and jurisdiction.[20] The Court held both that the compact

---

**19.** *See also, Bonnette v. Tunica–Biloxi Indians,* 873 So.2d 1 (La.Ct.App.3 Cir.2003), which recognized that the Tribe *retained* jurisdiction of tort claims brought by patrons of casinos in a compact which provided that the "full territorial and subject matter jurisdiction" of the Tribe was preserved and that the Tribe would adopt procedures for disposition of tort claims. This conclusion was reached despite the compact also con-

taining a provision which stated that the State and the Tribe had concurrent jurisdiction to fully "ensure the protection of the public," the Tribe, and the State.

**20.** Section 8 of the Compact provides:

Protection of Visitors. The safety and protection of visitors to a Gaming Facility is a priority of the Tribe, and it is the purpose of this

created a concurrent state-tribal jurisdiction for personal injury tort claims, by agreement of the parties, and that IGRA permitted such a negotiation and outcome.

¶ 17 An earlier case, *Diepenbrock v. Merkel*, 33 Kan.App.2d 97, 103, 97 P.3d 1063 (2004), considered subject matter jurisdiction for a wrongful death action. The deceased died of a heart attack suffered on tribal land owned in fee by the tribe. The tribal gaming compact gave the tribe civil jurisdiction for tort matters relating to Class III gaming on their reservation. The Court spoke to the linchpin of the matter at p. 1067, as follows:

> Perhaps the critical fact in this case is that all events surrounding Diepenbrock's cause of action occurred on tribal property.... The law recognizes a preference for tribal sovereignty and jurisdiction or deference to the tribal court over matters concerning their members and their territories. *Oklahoma Tax Comm'n v. Potawatomi Tribe*, 498 U.S. at 509, 111 S.Ct. 905, 112 L.Ed.2d 1112....
>
> It would undermine the authority of the tribal courts over reservation affairs and hence would infringe on the right of the Prairie Band Potawatomi Nation to govern themselves if jurisdiction did not reside in the tribal courts in this case....

¶ 18 In *Kizis v. Morse Diesel International*, 260 Conn. 46, 794 A.2d 498 (2002), the Connecticut Supreme Court addressed the issue of jurisdiction in a case involving a patron of a tribal casino who brought a negligence action against the tribe's employees seeking damages for personal injuries sustained at the casino. The Court held that subject matter jurisdiction was lacking in state court and that the proper forum was the Mohegan Gaming Disputes Court. This result was reached after the Court considered the express language of the compact,[21] the fact that the tribal constitution provided a forum and mechanism to redress the patron's injuries, and that IGRA permitted such a result.

¶ 19 IGRA recognizes the concept of concurrent state and tribal involvement in gaming.[22] When one considers how the courts in North Carolina, New Mexico, Kansas, and Connecticut have addressed the issue, it becomes clear that the absence of a jurisdiction-shifting agreement is important. When a tribe complies with IGRA and has established the required court system or appropriate dispute resolution system, jurisdiction, as a matter of comity and potential for infringement of self-governance, belongs in tribal court.

¶ 20 The United States Supreme Court has not decided whether a tribal court has jurisdiction over claims resulting from the conduct of non-Indians coming onto tribal land to voluntarily participate in a gaming enterprise. Nevertheless, it has hinted that a tribal court could have inherent civil jurisdiction over nonmembers. For instance, in *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), the Court answered the question of whether a tribal court may assert jurisdiction over civil claims (including a § 1983 claim) against state officials who entered tribal land to execute a search warrant against a tribal member suspected of

---

section to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation. To that end, in this Section, and subject to its terms, the Tribe agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in a court of competent jurisdiction, at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise. For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal

court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.

21. See discussion note 15, supra.

22. Title 25 U.S.C. § 2710(d)(5) provides:

> Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal–State compact entered into by the Indian tribe under paragraph (3) that is in effect.

having violated state law outside of the reservation.

¶ 21 The *Nevada* Court expressly noted that previously, in *Strate v. A–1 Contractors,* 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), the Court "assumed that where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumably lies with the tribal courts." It also specifically limited its holding to the question of tribal court jurisdiction over state officers enforcing state law, but left open the question of tribal court jurisdiction over nonmember defendants in general.[23] *Nevada* is not dispositive. Answering the question of whether a tribal court may be a court of general jurisdiction in which to resolve § 1983 claims does not also answer the question of whether a tribal court may resolve tort claims brought by nonmembers arising out of IGRA authorized gaming operations on tribal lands.

¶ 22 Likewise, *Montana v. United States* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), involved the narrow issue of the power of a Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe. The Court agreed with a lower court holding that the Tribe may prohibit nonmembers from hunting or fishing on land belonging to the Tribe or held by the United States in trust for the Tribe. It also agreed that if the Tribe permits nonmembers to fish or hunt on such land, it may condition their entry by charging a fee or establishing bag and creel limits. In deciding the case, the Court developed the *Montana* test which states that:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of

civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.... A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana* did not discuss gaming or gaming enterprises, nor did it discuss what would satisfy either test—except for concluding that non-Indian hunters and fishermen on non-Indian fee land did not enter into any agreements or commercial dealings with the tribe, nor were hunting and fishing a threat to the Tribe's political or economic security so as to justify tribal regulation.

¶ 23 Finally, in *Plains Commerce Bank v. Long,* —— U.S. ——, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008), the Court again discussed the *Montana* test in a case involving a non-Indian bank and its sale of non-Indian land it owned within a tribal reservation. The Court determined that the *Montana* exception to asserting tribal jurisdiction did not apply because the land at issue had been owned by a non-Indian party for at least 50 years and its resale to another non-Indian could not possibly imperil the substance or welfare of the tribe. *Plains* held that *Montana* did not permit tribes to regulate the sale of non-Indian land, but that a tribe could

---

23. *Nevada v. Hicks,* 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Footnote 2 of the opinion provides:

> In *National Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 855–856, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), we avoided the question whether tribes may generally adjudicate against nonmembers claims arising from on-reservation transactions, and we have never held that a tribal court had jurisdiction over a nonmember defendant. Typically, our cases have involved claims brought against tribal defendants. See, *e.g., Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). In *Strate v. A–1 Contractors,* 520 U.S. 438, 453,

117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), however, we assumed that "where tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumably lies in the tribal courts," without distinguishing between nonmember plaintiffs and nonmember defendants. See also *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general.

regulate the conduct of non-members inside the reservation that implicates the tribe's sovereign interest. Clearly, *Plains* was written in the context of a non-Indian land dispute, and it does not mention IGRA or tribal gaming enterprises.

¶ 24 The Supreme Court has never addressed whether tribal gaming enterprises might satisfy the *Montana* test resulting in a tribal court having "inherent" authority to hear such disputes as the one involved here. It has, however, recognized that gaming enterprises can serve as a core, essential component of the economic security of a tribe. In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), a case which sparked the enactment of the 1988 Indian Gaming Regulatory Act, the Court recognized that the bingo and card games conducted on the reservation and predominately played by non-Indians were a major source of employment for the Tribe, and the profits were the Tribe's sole source of income. In *Cabazon*, the Court held that "the State's interest in preventing the infiltration of the tribal bingo enterprises by organized crime did not justify state regulation of the tribal bingo enterprises in light of the compelling federal and tribal interests supporting them. State regulation would impermissibly infringe on tribal government, and this conclusion applies equally to the county's attempted regulation of the Cabazon card club."

¶ 25 Under the "*Montana* approach" the Tribe might make an evidentiary showing that the regulation of gaming, including the disposition of tort claims asserted against it, satisfies *Montana*. The Tribe needs to show that its gaming enterprises serve as a core, essential component of its economic security. Here, because the matter was decided on a motion to dismiss, there is no evidence in the record to support such a result. The Court should remand the matter so that the Tribe may, if it can, make an appropriate evidentiary showing before concluding as the majority has that "[i]n the present case, we find the Tribe has not met is burden of establishing that it falls within one of *Montana's* exceptions."

## III.

## WHETHER THE STATE HAS ACCEPTED JURISDICTION UNDER P.L. 280 AND THE EXISTENCE AND PROFICIENCY OF A TRIBAL COURT SYSTEM.

¶ 26 It is undisputed that Oklahoma was not a state which was allowed to assert civil jurisdiction over Indian Tribes in Oklahoma under Public Law 280. The majority finds that this is not an impediment to the assertion of jurisdiction over this dispute by the District Courts of Oklahoma. The majority refers to *Lewis v. Sac and Fox Tribe of Oklahoma Housing Authority*, 1994 OK 20, ¶ 12, 896 P.2d 503.

¶ 27 *Lewis* involved two tribal members who entered into a contract by which title to their home and land would pass to them on September 1, 1990. When they received a warranty deed conveying the surface rights only, they sued for specific performance and an accounting for all oil and gas revenues the Housing Authority had received since the date of the conveyance. The Authority objected to the jurisdiction of the district court.

¶ 28 One of the issues was whether Congress "ousted" state courts of concurrent jurisdiction to consider contract actions involving land transactions between Indian buyers and statutorily created Indian housing authorities of the state. I was a dissenter in *Lewis* and, as thoroughly explained by the dissent in which I joined, the issue in *Lewis* was not whether Oklahoma had been "ousted" from "concurrent" jurisdiction, but rather whether the transaction occurred within Indian Country. If it did not, the state clearly has jurisdiction. However, if it did occur in Indian Country, any jurisdiction held by the state must be as a direct result of federal congressional action or federal case law. Ultimately the dissent concluded that the transaction did not occur in Indian Country.

¶ 29 Nevertheless, *Lewis* remains the law in Oklahoma. It held that because Congress had not affirmatively ousted the state courts of their concurrent jurisdiction to entertain contract actions involving land transactions between Indian buyers and state-created In-

dian housing authorities, Oklahoma state courts had inherent concurrent jurisdiction. The *Lewis* Court determined that because Oklahoma did not take the appropriate steps to take jurisdiction under PL–280, the proper inquiry to be made must be focused on the congressional policy of fostering tribal autonomy in light of pertinent United States Supreme Court jurisprudence.

¶ 30 In *Lewis,* the Court looked at two factors to determine whether the State of Oklahoma had concurrent jurisdiction: 1) whether the litigation was explicitly withdrawn by Congress; and 2) whether it infringed upon tribal self-government. Even though *Lewis* involved a specifically prescribed and state created Indian Housing Authority, and this case involves a tribal gaming enterprise, the same factors could be applied here to determine whether the State of Oklahoma has concurrent jurisdiction. Congress did not explicitly withdraw such litigation from state courts. In this instance, Congress left it up to the States and Tribes to negotiate where the litigation would occur. Whether tort claim litigation infringes upon tribal self-government could depend upon whether the tribe has established an appropriate court system.[24] The tribe should be given an opportunity to make a showing that the State's assertion of jurisdiction would in fact infringe upon self governance.

¶ 31 Here, the tradition of Cherokee courts is deeply rooted in the history of this State.

The Cherokee Nation has had a functioning Supreme Court since 1823 [25] and a written constitution since 1839. By the 1880s, it had built nine courthouses in Oklahoma,[26] one of which holds the distinction of being the oldest governmental building in the State of Oklahoma.[27] (In 1993, West Publishing Company published the Cherokee Nation Code Annotated.)

¶ 32 It is undisputed that Congress has vacillated in its treatment of Native Americans. They were not made citizens of the United States of America until June 2, 1924, and as late as 1914, the Fort Sill Apache (Chiricahua), were still prisoners of war. (Ironically, the last baby born in captivity, Mildred Cleghorn, grew up to be the Chairman of the Tribe.) Congress terminated the tribal court system through the Curtis Act of 1898, to clear the way for statehood, and it shifted most legal issues to the Federal Courts.[28] However, in the mid–1950's Congress began a movement of restoration and it recognized that tribal government cannot truly function without tribal courts. In 2001, it established the Tribal Court Assistance Program designed to establish, improve, and expand the functionality of the tribal court system. It is estimated that tribal courts will receive $8,630,00 by the end of the 2008 fiscal year.[29]

¶ 33 The Oklahoma Legislature also recognizes the competency of tribal courts. Title 12 O.S.2001 § 728 provides:

24. One of the policies behind the Indian Regulatory Gaming Act is to promote self-sufficiency and self-governance. Title 25 U.S.C. § 2702 provides in pertinent part:
   Declaration of policy
   The purpose of this chapter is—
   (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; ...
   When a tribe has created the authority to facilitate and act as the governmental entity responsible for managing all aspects of the tribe's gaming enterprise, including the creation of a court system, then refusing to recognize this mechanism as an appropriate means of resolving tort disputes which arise out of gaming would also ignore the express policy declared in IGRA.

25. Strickland, Rennard, "Fire and the Spirits, Cherokee Law from Clan to Court." pp. 73–75 University of Oklahoma Press (1975). The author notes that according to the Record Book of

the Supreme Court of the Cherokee Nation, the Court heard 21 cases in 1823.

26. O'Dell, George, Professor of Anthropology, "Saline Courthouse," www.personal.utulsa.edu. Retrieved 10/30/08; "Cherokees Fund Restoration Project for Historic Courthouses," Native American Times, Retrieved 10/30/08.

27. Davis, Kirby Lee, "These Walls: The Cherokee Nation Supreme Court Building in Oklahoma," Journal Record, August 8, 2008; McMahan, Liz, "Cherokee Nation Supreme Court Building to Get Face Lift," Muskogee Phoenix, August 12, 2008.

28. Cohen's Handbook of Federal Indian Law, 2005 ed. §, 1.07, pp. 98–99.

29. The Catalog of Federal Domestic Assistance, "16.608 Tribal Court Assistance Program." http://www.cfda.gov. Retrieved 11/14/2008.

A. This act affirms the power of the Supreme Court of the State of Oklahoma to issue standards for extending full faith and credit to the records and judicial proceedings of any court of any federally recognized Indian nation, tribe, band or political subdivision thereof, including courts of Indian offenses.

B. In issuing any such standard the Supreme Court of the State of Oklahoma may extend such recognition in whole or in part to such type or types of judgments of the tribal courts as it deems appropriate where tribal courts agree to grant reciprocity of judgments of the courts of the State of Oklahoma in such tribal courts.

This Court followed suit by adopting a district court rule for recognition of judicial proceedings in tribal court.

¶ 34 The rule recognizes that judgments from tribal courts are entitled to full faith and credit in the same manner as a similar or comparable judgment of a sister state.[30] Had this tort occurred at a race track in Hot Springs or a ski slope in Colorado, no one would expect that the lawsuit would be heard by the District Court of Rogers County.

The same is true of tribal courts just as it is with sister states. A person going onto tribal land, entering into and participating in a tribal enterprise, should expect to bring the suit in the location of the sovereign—the Tribe, rather than in a state district court. It has been said that Tribal Sovereignty and Tribal jurisdiction have, from the beginning, been treated by the United States Government and the State of Oklahoma as a solid, intact mass—like a rock. This rock remains intact unless and until Congress decides to chip pieces of it away (which it has through various enactments) to grant jurisdiction to the federal or state courts. The majority, on the other hand, treats Tribal jurisdiction as having begun with nothing, to which Congress must add something in order to create jurisdiction. This, in my view, is wrong, and I would remand the matter to allow the Tribe to make a showing concerning whether the State's assertion of jurisdiction would infringe on it's self-governance.

## CONCLUSION

¶ 35 The State's self-interest is served by entering into a compact with the Tribe.[31]

---

**30.** Rules for the District Court of Oklahoma, Rule 30, 12 O.S.2001 Ch. 2, App. provides in pertinent part:
> A. Standards
> (1) "Tribal Court" means any court or constitutionally established tribunal of any federally recognized Indian nation, tribe, pueblo, band, or Alaska Native village, duly established under federal law or tribal law, including Courts of Indian Offenses organized pursuant to Title 25, Part 11 of the Code of Federal Regulations.
> (2) "Judicial Officer" means any judge, justice, magistrate or other officer duly seated and authorized under federal or tribal law to resolve disputes and enter tribal judgments in a tribal court.
> (3) "Tribal Judgment" means any final written judgment, decree or order of a tribal court duly signed by a judicial officer and filed in a Tribal Court.
> B. Recognition of Tribal Judgments–Full Faith and Credit
> The district courts of the State of Oklahoma shall grant full faith and credit and cause to be enforced any tribal judgment where the tribal court that issued the judgment grants reciprocity to judgments of the courts of the State of Oklahoma, provided, a tribal court judgment shall receive no greater effect or full faith and credit under this rule than would a similar or comparable judgment of a sister state. (Emphasis added.)

**31.** Title 3A O.S. Supp.2004 § 281(11A) provides in part:
> The parties acknowledge and recognize that this Compact provides tribes with substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma in respect to the covered games. In consideration thereof, so long as the state does not change its laws after the effective date of this Compact to permit the operation of any additional form of gaming by any such organization licensee, or change its laws to permit any additional electronic or machine gaming within Oklahoma, the tribe agrees to pay the following fees:
> 1. The tribe covenants and agrees to pay to the state a fee derived from covered game revenues calculated as set forth in paragraph 2 of this subsection. Such fee shall be paid no later than the twentieth day of the month for revenues received by the tribe in the preceding month; and
> 2. The fee shall be:
> a. four percent (4%) of the first Ten Million Dollars ($10,000,000.00) of adjusted gross revenues received by a tribe in a calendar year from the play of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games,

IGRA embodies the general goal of federal Indian policy: to allow tribal self-government with federal control.[32] Before Class III gaming can be legal on Indian lands, the tribe and the state must have negotiated a compact which has been approved by the Secretary of the Interior.[33] In other words, IGRA requires States and Tribes to negotiate regarding the scope of authorized gaming and the State's role in Indian gaming. As part of this process, IGRA allows States and Tribes to negotiate and to include jurisdiction-shifting provisions in the compact.[34]

¶ 36 If Congress had not considered tribal courts to have subject matter jurisdiction over lawsuits which relate to or arise out of gaming and gaming enterprises, why would it have included a provision in IGRA which allowed Tribes and States to negotiate an allocation of jurisdiction to the states? Furthermore, the State of Oklahoma as well as this Court has recognized tribal courts as equivalent to those of a sister state; yet the implication of the majority opinion is that tribal courts are not courts of competent jurisdiction.

¶ 37 In *Bittle v. Bahe*, 2008 OK 10, ¶¶ 52–53, 192 P.3d 810, the Court held that the tribe had waived its sovereign immunity merely because it filed for and received a liquor license. The request of a license, it was said, constituted an express and knowing waiver of sovereign immunity. Yet here, the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

b. five percent (5%) of the next Ten Million Dollars ($10,000,000.00) of adjusted gross revenues received by a tribe in a calendar year from the play of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games,

c. six percent (6%) of all subsequent adjusted gross revenues received by a tribe in a calendar year from the play of electronic amusement games, electronic bonanza-style bingo games and electronic instant bingo games, and

d. ten percent (10%) of the monthly net win of the common pool(s) or pot(s) from which prizes are paid for nonhouse-banked card games. The tribe is entitled to keep an amount equal to state payments from the common pool(s) or pot(s) as part of its cost of operating the games.

Payments of such fees shall be made to the Treasurer of the State of Oklahoma. Nothing herein shall require the allocation of such fees to particular state purposes, including, but not limited to, the actual costs of performing the state's regulatory responsibilities hereunder.

**32.** Title 25 U.S.C. § 2701 provides:

The Congress finds that—

(1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

(2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

(3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

(4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

Title 25 U.S.C. § 2702 provides:

The purpose of this chapter is—

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

**33.** Title 25 U.S.C. § 2710.

**34.** Title 25 U.S.C. § 2710(d)(3)(C) provides:

(C) Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to—

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

majority expresses concern that if non-tribal members voluntarily enter tribal land and choose to partake in a tribal gaming enterprise, they may somehow unknowingly waive their right to bring a tort suit into district court. Assuming that the state district court had jurisdiction to hear such disputes in the first place, the waiver certainly is not any less express or knowing than that which was held to be a waiver in *Bittle*.

¶ 38 The majority does not give proper consideration to the fact that tribal courts are courts of competent jurisdiction and fails to recognize that they may have both inherent authority and the authority under IGRA to decide tort claims which arise out of events occurring at a tribal casino. It is immaterial whether the plaintiff is a tribal member, member of another tribe, or a non-Indian, when he or she voluntary enters onto tribal land to do business with the Tribe. I cannot concur in the opinion. I would remand the matter to the trial court to: 1) consider the parties' true intent in leaving jurisdiction *status quo* and referring to "court of competent jurisdiction;" 2) allow the Tribe to attempt to make an appropriate evidentiary showing that its gaming enterprise serves a core, essential component of the economic security of the Tribe; and 3) allow the Tribe to attempt to make a showing that the State's assertion of jurisdiction would infringe on the Tribe's self-governance.

REIF, J., dissenting:

¶ 1 I respectfully dissent.

¶ 2 The majority holds that a State District Court has jurisdiction to determine the liability of the Cherokee Nation for a tort claim arising from the Cherokee Nation's gaming activity on tribal land. In essence, the majority reasons that the Tribal Gaming Compact between the Cherokee Nation and State of Oklahoma is a part of the law of the State of Oklahoma and, therefore, tort claims against the Cherokee Nation that arise under the Compact are enforceable in State District Courts.

¶ 3 To be sure, the Compact does delineate the legal relationship between the State of Oklahoma and the Cherokee Nation with respect to tribal gaming activity on tribal lands. In that sense, the Compact does represent the law of the State of Oklahoma. However, the legal relationship between the State of Oklahoma and Cherokee Nation under the Compact is not one of regulator and licensee as in the case of *Bittle v. Bahe*, 2008 OK 10, 192 P.3d 810.[1] The relationship in the case at hand is "a government to government relationship"[2] involving a sovereign to sovereign agreement. The Compact represents the *mutually agreed* conditions under which the Cherokee Nation may conduct Class III gaming on Cherokee lands located within the territorial limits of the State of Oklahoma.

¶ 4 Under the Compact, the Cherokee Nation waived its sovereign immunity and agreed to a system of tort liability comparable to that found in Oklahoma's Governmental Tort Claims Act. However, the Compact does not expressly extend Oklahoma's Governmental Tort Claims Act or any other Oklahoma tort law to the lands of the Cherokee nation.[3] More importantly, the Compact does not expressly allocate civil jurisdiction

---

1. In the case of *Bittle v. Bahe*, this Court held that a State District Court had jurisdiction to determine the "dram shop" liability of an Indian tribe for alcohol served on tribal land under license by the State. However, in the *Bittle* case, the State of Oklahoma exercised power delegated by Congress to regulate the sale and distribution of alcohol by Indian tribes. I concurred in *Bittle* because I am of the opinion that Indian tribes stand in the same dependent relationship to the State's exercise of such delegated power as they do to the direct exercise of such power by Congress. Because Congress could impose "dram shop" liability, enforceable in state courts, as a regulatory measure, the State of Oklahoma could also extend such liability in exercise of its delegated power. Unlike *Bittle*, the case at hand

involves no delegation of power to the State of Oklahoma to regulate gaming activity.

2. Part 2, Subsection 3, of the Compact.

3. The majority characterizes plaintiff Cossey as an "invitee" and declares "the Tribe had the duty to exercise reasonable care to keep the premises in a reasonably safe condition and to warn Cossey of conditions which were in the nature of hidden dangers, traps, snares or pitfalls." While this is a correct statement of the common law rules of premises liability, such rules are part of the tort law of the State of Oklahoma. Nothing in the record reflects that the Cherokee Nation has adopted common law rules of premises liability as the law of the Cher-

to the State of Oklahoma for tort *claims against the Cherokee Nation* that arise from the Cherokee Nation's gaming activity on Cherokee lands.[4]

¶ 5 The State of Oklahoma and the Cherokee Nation expressly agreed that: "Th[e] Compact shall not alter tribal, federal or state civil adjudicatory or criminal jurisdiction." In other words, a court or courts of competent jurisdiction to determine the liability of the Cherokee Nation under the Compact would be the same court or courts that could adjudicate the liability of the Cherokee Nation for tribal activity on tribal land in absence of the Compact. In non-Compact cases, the Courts of the Cherokee Nation are the only courts of competent jurisdiction to adjudicate the liability of the Cherokee Nation for activity by the Cherokee Nation on Cherokee lands.[5]

¶ 6 The fact that tribal courts are courts of limited jurisdiction with respect to *private*

disputes involving non-Indians is no barrier to the exercise of jurisdiction by the Courts of the Cherokee Nation over a non-Indian's tort claim against the Cherokee Nation for activity by the Cherokee Nation on Cherokee lands. While the Compact secures a tort remedy against the Cherokee Nation for Indians and non-Indians alike, it does not secure the enforcement of that remedy in the courts of the State of Oklahoma, or by the federal courts in absence of an independent federal question, such as a denial of due process.[6]

KAUGER, J., dissenting to the denial of rehearing:

¶ 1 I would grant rehearing to re-examine the plurality opinion.

okee Nation. More importantly, the Compact does not require the Cherokee Nation to adopt or apply any particular rules of tort law, but only to "ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim for personal injury or property damage." The Compact is not only silent regarding the application of Oklahoma tort law, but Part 6, Subsection D, reflects intent that tribal tort law is the applicable tort law. Subsection D provides remedies in cases where the Tribe has no insurance or inadequate insurance to pay a tort claim. In such cases the Tribe must (1) establish an escrow account to pay awards, (2) give the claimant and the state certain information about the escrow account, and (3) provide "notice and hearing opportunities in accordance with *the tribe's tort law,* if any." (Emphasis added.)

4. Title 25 U.S.C. § 2710(d)(3)(C)(i) and (ii).

5. The concurring in part; dissenting in part opinion asserts that there are at least three jurisdictional options—federal, state or tribal court—based on the facts presented. My disagreement with the concurring in part; dissenting part opinion concerning federal court jurisdiction is that a tort claim against the Cherokee Nation arising under the Compact does not in and of itself involve a federal question to support the exercise of jurisdiction by the federal courts.

6. I also disagree with the conclusions in the majority opinion and the concurring in part; dissenting in part opinion that the Cherokee Nation must demonstrate one of the *"Montana* exceptions" before the Courts of the Cherokee Na-

tion can exercise jurisdiction over a non-Indian's compact-based tort claim against the Cherokee Nation for activity on Cherokee Lands. The *only* condition in the Compact for the exercise of tribal court jurisdiction is that the Cherokee Nation "ensure that patrons of a facility are afforded due process in seeking and receiving just and reasonable compensation for a tort claim." In my opinion, it is the claimant that has the burden of demonstrating the denial of due process by a tribal court. Such a denial of due process could conceivably give rise to a federal question that would support the exercise of federal court jurisdiction over a Compact-based tort claim against the Cherokee Nation. Congress has generally mandated that no Indian Tribe in exercising powers of self government shall deprive any person of liberty or property without due process of law. Title 25 U.S.C. § 1302. This includes exercise of its judicial power. Title 25 U.S.C. § 1301(2).

Even if one of the *"Montana* exceptions" was required for the exercise of jurisdiction by the Courts of the Cherokee Nation, I believe a non-Indian patron at a Cherokee Nation casino has voluntarily entered tribal land to conduct commercial activity with the tribe, in the same way a non-Indian might enter tribal land to conduct business with the Cherokee Nation's nursery and landscaping enterprise. In this latter instance, the Courts of the Cherokee Nation clearly have jurisdiction under the "second *Montana* exception" to determine any liability the Cherokee Nation may have for injury or property loss sustained by a non-Indian in the course of such a transaction.